RICHARDS FURNITURE CORPORATION *v.* BOARD OF COUNTY COMMISSIONERS OF ANNE ARUNDEL COUNTY, ET AL.

[No. 136, September Term, 1963.]

252

254

*Decided, per curiam, December 18, 1963.*

*Opinion filed January 8, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*C. Edward Hartman, II,* with whom was *John W. Hessian, Jr.,* on the brief, for appellant.

*Loring E. Hawes, Assistant Attorney General,* and *Jerome F. Connell, Special Assistant Solicitor of Glen Burnie,* with whom were *Thomas B. Finan, Attorney General,* and *Henry J. Tarrantino, County Solicitor for Anne Arundel County,* on the brief, for appellees.

PRESCOTT, J., delivered the opinion of the Court.

We, heretofore, decided this case by a *per curiam* order. We now state our reasons for the decision.

The appellant challenges the validity of an Act of the General Assembly, set forth below. It has literally "thrown the book" at the Act. It states nine separate questions to be answered, with the eighth subdivided into three questions and the ninth into six. In the early case of *Anderson v. Baker,* 23 Md. 531, which dealt with constitutional questions, the opinion occupies ninety-eight pages of the reports. The questions here posed present, we think, no serious difficulty; hence this opinion should be considerably shorter.

The appellant, Richards Furniture Corporation (Richards), filed a bill in equity, praying declaratory and injunctive relief

to declare unconstitutional the provisions of Code (1957), Article 27, § 521 (b), as amended by Chapter 13 of the Acts of the General Assembly of 1962 (Special Session), (hereafter referred to as "the Act" or "the Bill"), and to enjoin enforcement thereof by the appellees, law enforcement officials of Anne Arundel County. In the alternative, it sought a declaration that the Act did not apply to its particular business. From a decision holding that the Act was valid and that appellant's business came within its provisions, this appeal resulted.

Richards, a Maryland Corporation, rents space and sells furniture in a large building built and owned by the Ritchie Highway Farmers Market, Inc. (Market), known as and called the Ritchie Highway Farmers Market. The building is approximately 643 feet long while its width varies from 107 to 172 feet depending upon the shapes of its various departments. Space is leased to some thirty-four merchants. The store building is set up with two separate, parallel, pedestrian aisles running from one side of the building to the other, dividing it into three areas. Each tenant leases a designated area fronting on one or both aisles and his space is partitioned off by high walls on the sides. Access to each shop is gained from an entrance off one of the aisles. In this respect, Richards' store is slightly different in that it is fully partitioned off from the aisles by a ceiling-high masonry wall with conventional doors, and it has an independent outside entrance for customers.

The evidence indicates that the Market building, in its entirety, is open for business on Wednesdays and Thursdays from 4:00 to 10:00 p.m.; Fridays and Saturdays from 10:00 a.m. to 10:00 p.m.; and on Sundays from 12:00 noon to 6:00 p.m. The evidence further reveals that approximately 30,000 automobiles visit the Market each week, of which one-third of the total arrive every Sunday. In short, about one-third of the weekly business is transacted on Sundays. Not only does the Market, by its advertisements, hold itself out as the sole and responsible owner of the Market, containing a number of shops and selling a variety of goods, but it exercises a great deal of control over the merchants who occupy space within the Market building. These controls over the individual merchants include, among other things, the selection and pricing of prod-

ucts to be sold, the methods of merchandising these products, the advertising which can be done, the hours of business that the individual merchants may be open, the hours that they must close, the selection and behavior of their personnel, and the reimbursement of monies to purchasers of products. It is also significant that the occupants of the entire building are accommodated by one large parking lot, which is owned and operated by the Market. It also hires special police to control the traffic, and the conduct of individuals on the parking lot area and throughout the entire market building. The testimony also showed that it is the generally accepted practice of the Market to have no more than one merchandiser of a particular class of products occupying space within its building; Richards is the only furniture department therein. And although the building is called the Ritchie Highway Farmers Market, little, if any, actual farm produce is sold therein.

The Act complained of reads as follows:

"In Anne Arundel County, in addition to the articles of merchandise herein before mentioned, retailers may sell, barter, deal in, and deliver on Sunday the following articles of merchandise [many articles of merchandise, not relevant here] ; provided, however, that nothing in this sub-title shall be construed to prevent the operation of any retail establishment on Sunday, the operation of which does not entail the employment of more than one person, not including the owner or proprietor. *Every market or department store in which stalls or departments are rented or concessions given to individual merchants or vendors shall be considered as one establishment and each stall or department thereof is not a separate establishment.*"

(The italicised portion above was added by the amendment of 1962.)

### I, II, III, IV, V.

We shall consider the first five of appellant's contentions under this heading. It asserts that the Maryland Constitution prohibits a special session of the General Assembly from enacting "a non-emergency local bill," citing Article II, Section

16, and Article III, Sections 14, 15 and 27, thereof. It admits finding no Maryland decision to this effect and that the Constitution does not explicitly state any such prohibition, but argues the above sections implicitly do so. We do not find it necessary to set forth the sections in detail. The Maryland Constitution is not a grant of powers to the General Assembly, but a statement of limitations on its otherwise plenary powers. *Maryland Committee v. Tawes,* 228 Md. 412, 439, 186 A. 2d 656.

A careful reading of the Constitution reveals that the only constitutional limitations on extraordinary, or special, sessions are: (1) that the session be convened by a proclamation of the Governor (formerly this was not required); (2) the session shall last no longer than thirty days; and (3) no additional compensation, except mileage and other allowances provided by law, shall be allowed members for such sessions. Section 15 provides that the General Assembly, once properly convened, shall be the sole judge of how long "the public interest may require" (within certain limitations) it to continue in session. There can be little doubt that, at a special session, the public interest requires the Legislature to remain in session, within the thirty-day limit, as long as any necessary and proper legislation is under consideration and before it. Cf. Article III, Section 56.

We find no express nor implied provision in the Constitution preventing the passage of a "non-emergency local bill" at a special session. It is generally held that in the absence of constitutional limitation, the legislative power of a Legislature, when convened in extraordinary session, is as broad as its powers in its regular sessions. 50 Am. Jur., *Statutes,* § 46; *State v. Majors,* 16 Kan. 440; *Woessner v. Bullock,* 93 N. E. 1057 (Ind.); *State v. Fair,* 76 P. 731 (Wash.); *Morford v. Unger,* 8 Iowa 82. We, therefore, hold that the General Assembly was not prohibited from passing the Act because it was a non-emergency local bill.

What we have said above also nearly answers the next four of appellant's contentions. However, we shall add a few further comments concerning them.

The appellant next attacks the Act on the ground that it was not within the Governor's proclamation. The Constitution of Maryland grants no authority to the Governor to limit, by his proclamation, the powers of the Legislature. In the absence of such a restrictive provision, the authorities hold, as stated above, that the powers of the Legislature at a special session are as broad as at its general ones. 82 C.J.S., *Statutes,* § 10; 50 *Am. Jur., Statutes, supra;* 1 Cooley, *Constitutional Limitations* (7th ed.), 222; *Morford v. Unger, supra; State v. Fair, supra.* (These two cases deal specifically with the question under immediate consideration.) For cases where state constitutional provisions limited legislation to that in the Governors' proclamations, see those cited under C.J.S. and *Am. Jur., ibid.*

Appellant also claims it "was denied its constitutional rights because of a lack of notice of the intended legislation." It does not state the constitutional provisions alleged to have been violated, nor does it cite any case in support of this contention. It cites one or more cases which deal with the title requirements of Article III, Section 29, and seems to argue from certain language in the opinions of cases decided thereunder (which deal with titles) that "notice" of proposed legislation must be given to each citizen and corporation affected by it. Unless the Constitution so provides, due process does not require that notice and hearing be provided in order to validate legislation. 1 Sutherland, *Statutory Construction* (3rd ed.) § 1012, p. 159; note, 28 Col. L. Rev. 619. There is no provision for such notice in the Maryland Constitution. We may note, however, that "notice" is inherent in the legislative process in this State. Under our democratic form of government, the Senators and Delegates are elected as representatives of the people. Ample safeguards in the Constitution provide that these representatives shall have notice of proposed legislation: each bill must be read on three different days in each House (unless a two-thirds vote authorizes otherwise), Article III, Section 27; no bill shall be read a third time unless actually engrossed or printed, *Ibid.;* and a journal of the proceedings in both Houses must be made and published, Article III, Section 22. We find no merit in this contention.

In arguing that it "was denied its constitutional rights be-

cause of the lack of opportunity for a hearing or the right to petition the legislature," appellant again cites cases dealing with titles to bills under Section 29 of Article III. Our constitution, as stated above, does not require that a hearing be held upon suggested legislation; Article 13 of the Declaration of Rights provides: "That every man hath a right to petition the Legislature for the redress of grievances in a peaceable and orderly manner."

The right of petition first appeared in Magna Carta, Chapter 61, and was incorporated in the English Bill of Rights of 1689. Corwin, *Constitution, United States,* 82 Congress, 2d Session Senate Document No. 170, p. 805. However, the meaning of the "right to petition the Legislature for redress of grievances" can best be understood in the context of the pre-Revolutionary period between the enactment of the Stamp Act in 1765 and the Declaration of Independence by the Colonies in 1776. Morgan, *The Stamp Act Crisis,* pp. 53-70; Rossiter, *Seedtime of the Republic,* 319. The celebrated trial in 1734 of John Peter Zenger, the newspaper editor and pamphleteer, for seditious libel had shown the colonists the fate to be expected by outspoken critics of British policy. Drinker, *The Four Freedoms of the First Amendment,* p. 5. The suppression by the British of written and spoken criticism by the Colonists of British colonial policies was one of the real fears of the period. Cooley, *op. cit.* 498; 1 Blackstone; *Commentaries* (Lewis ed.), 142 (3). And the rights of the Colonists, as Englishmen, to the freedom of speech, press, assembly and petition were among the most cherished rights of the citizens of that time. It was in the light of this background that the framers of the Declarations of Rights of the original States and the Bill of Rights of the Federal Constitution drafted the provisions relating to the "right to petition" the legislative branch of the government.

It is clear, we think, that the authors and the people who actually adopted our Declaration of Rights intended no more than to permit any person or peaceable assembly of persons, without fear of reprisal or prosecution, to communicate directly with the legislative body by way of a statement of grievances and a petition requesting a correction of wrongs previously committed. The appellant is seeking herein not a right to pe-

tition for the *redress* of an alleged grievance after the passage of a law which it does not like, but the right of a hearing and a right to petition *before* the passage of the law. The right guaranteed by Article 13 provides no assistance to the appellant in this regard.

The right of petition guaranteed by the First Amendment to the Federal Constitution has now been extended so as to prevent its denial by the States. *NAACP v. Alabama,* 357 U. S. 449; *De Jonge v. Oregon,* 299 U. S. 353; *United States v. Harriss,* 347 U. S. 612. However, we find nothing in the First Amendment nor in the Supreme Court decisions that aids the appellant in the contention now under consideration.

Under its argument that "the action of the Legislature as a whole constitutes unfair and unequal treatment to plaintiff," appellant lists no less than seventeen alleged errors in what it terms "outline form." Many of them are repetitions of claimed errors under other headings. Although all of them have been considered, we think only two deserve brief consideration in this opinion: (1) "K. Non-descriptive title of the bill"; and (2) "L. Reading of the bill by title only." The title complied with Section 29 of Article III. *Baltimore v. Perrin,* 178 Md. 101,[1] 12 A. 2d 261; and a reading of a bill by a reading of its title only is a sufficient "reading" thereof to satisfy the constitutional provision relating to three readings. *Stiefel v. Maryland Institution, etc.,* 61 Md. 144; *Worman v. Hagan,* 78 Md. 152, 162, 27 A. 616.

## VI and VII

Under these headings, appellant contends that "the Governor vetoed [the Act] by reason of his failure to sign it within six days after presentation to him," and "a litigant * * * may inquire behind the forms of authentication [of a bill] and the General Assembly actions * * *." The special session ended

1. The title reads as follows:

"An act to repeal and re-enact, with amendments, Section 521 (b) of Article 27 of the Annotated Code of Maryland (1961 Supplement), title 'Crimes and Punishments,' sub-title 'Sabbath Breaking,' to further define the kinds of retail establishments that may sell certain goods and merchandise on Sunday in Anne Arundel County."

on March 9, 1962. On the same day, the Chief Clerk of the House of Delegates delivered the Bill to the Secretary of State, who, on March 12, 1962, handed it, together with other bills, to the Governor. The Governor acknowledged their receipt by letter, and, in accordance with normal procedure, forwarded them to the Attorney General for review as to form and legal sufficiency. The authenticated copy of the Bill states in a memorandum signed by the Chief Clerk of the House that it was sealed and presented to the Governor on March 23, 1962; and it was signed by him on the same day.

Appellant argues that the authentication on the Bill is not conclusive, it has a right to go behind the same, and the Governor's letter and the testimony of the Chief Clerk "imply" that the Bill was "presented" on March 12, 1962. It is true that in a proper case the courts may inquire beyond the forms of authentication on a bill to determine whether it has been constitutionally enacted. *Berry v. Baltimore Drum Point Railroad Co.,* 41 Md. 446; *Legg v. Annapolis,* 42 Md. 203; *Redwood v. Lane,* 194 Md. 91, 69 A. 2d 907. However, an act which has been duly authenticated and published as law, as the Bill in the instant case has, bears a strong presumption that all constitutional provisions have been complied with, and it has been validly enacted into law; and this presumption continues to exist until the contrary is *clearly* made to appear. *Berry v. Baltimore Drum Point Railroad Co., supra; Baltimore Fid. Warehouse Co. v. Canton Lumber Co.,* 118 Md. 135, 84 A. 188; *Redwood v. Lane, supra.* And a statute which has been duly authenticated is not to be impeached by parol evidence alone. *Berry v. Baltimore Drum Point Railroad Co., supra; Ridgely v. Baltimore City,* 119 Md. 567, 87 A. 909.

The appellant's effort to impeach the certification by the Chief Clerk that the Bill was presented to the Governor on March 23, 1962, falls far short of what is necessary to accomplish such an impeachment; and demonstrates, we think, a failure to comprehend the true meaning of the "presentation" of a bill to the Governor as provided for by Article 2, Section 17, of the Constitution and Code (1957), Article 41, Section 45. Such a presentation to the Governor for his signature is a formal act and anticipates that the bill will be sealed with the great seal

and actually and formally "presented" to the Governor for his signature by the Secretary of the Senate or Chief Clerk of the House, who in the presence of the Governor, shall make a memorandum thereon in writing of the day and hour of its presentation, and sign the same. The mere informal receipt by the Governor's office of a bill for other purposes is not a requirement of law, and carries with it no legal significance such as to require action by the Governor in any specified time.[2] If this were not true, many practical difficulties would be encountered on such occasions as when several hundred bills passed by the General Assembly are delivered to the Governor before he has had time carefully to consider them and to have the Attorney General pass upon their validity. We hold that the Bill was actually presented to the Governor on March 23, 1962, and that this was a reasonable and legal time after passage of the Bill for its presentation. *Robey v. Broersma,* 181 Md. 325, 26 A. 2d 820.

The remainder of appellant's argument under these headings is answered by a short quotation from the opinion in the above case:

"After it has been presented to the Governor, there are three ways in which such a bill may become law: (1) by being signed by the Governor; (2) by being passed over his veto; (3) by his failure to return the bill within six days after its receipt by him unless the General Assembly has adjourned and thereby prevented its return. [citations] In the case before us, the Legislature [as in the case at bar] had adjourned before the bill was presented to the Governor, and, therefore, under the provisions of the Constitution, Art. II, Sec. 17, it could only become a law by the signature of the Governor."

---

2. It is not necessary, under the circumstances of this case, to determine whether the Governor had only six days after March 12 within which to sign the Bill in order to make it law, even if it had been formally presented to him on that date (as contended by appellant); hence this opinion is not to be construed as making any such determination.

## VIII

Under this heading, appellant argues that the Act violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article 23 of the Declaration of Rights. It contends that the Act fails to "meet the requirement regarding conformity among persons as such," and that it also fails "because it is so vague as not to give reasonable notice of the forbidden conduct."

These contentions present no serious difficulty. In the recent case of *McGowan v. Maryland,* 366 U. S. 420, wherein the Supreme Court affirmed a decision of this Court (*McGowan v. State,* 220 Md. 117, 151 A. 2d 156) that Court pointed out that the stipulation in Section 521 that permits shops with only one employee to remain open on Sunday and the other provisions of Maryland law which permit various sports and entertainment on Sunday were clearly fashioned for "the purpose of providing a Sunday atmosphere of recreation, cheerfulness, repose and enjoyment," and then stated: "* * * the constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State Legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." Compare *Ness v. Baltimore,* 162 Md. 529, 160 A. 8; *State v. Karmel Merchandising Corp.,* 186 A. 2d 352 (Me.). Thus it is seen that the basic portion of the Act has been found to be constitutional; consequently it is still so, unless the provision that "every market or department store in which stalls or departments are rented or concessions given to individual merchants or vendors shall be considered as one establishment" rendered it unconstitutional.

We think, and therefore hold, the Act conforms with the Maryland scheme as delineated by the Supreme Court in the passage quoted above. The operation of large commercial markets or department stores on Sunday would materially interfere with the recreational atmosphere of the day, while small retail operations will not. And we think the classifications pre-

scribed by the Act are reasonable and proper and are not of an invidious nature, *McGowan v. Maryland, supra,* being designed to prohibit on Sundays large commercial operations such as that here attempted by the Market.

And we do not find the statute vague or indefinite in a constitutional sense. It is unnecessary to elaborate upon this point in great detail. The Act is couched in plain and simple language, which may be easily understood by persons of ordinary intelligence. This is all that is required of a statute in order to prevent it from being vague and indefinite in a constitutional sense. *United States v. Alford,* 274 U. S. 264; *Connally v. General Const. Co.,* 269 U. S. 385; and the Note "The Void-For-Vagueness Doctrine in the Supreme Court," 109 Penn. L. Rev. 67.

The appellant finally asks us to define the meaning of seven words in the amendment made by the Act, and to find that, even though it was constitutionally enacted, appellant's operation does not come within the conduct proscribed therein. This Court does not render advisory opinions. *Tanner v. McKeldin,* 202 Md. 569, 97 A. 2d 449. We, therefore, proceed to a consideration of whether appellant's conduct of its business on Sundays is prohibited by the Act. We are impelled to agree with Judges Duckett and Evans in their finding that appellant's conduct of its business within the Market must be classified as a department within a large retail operation. The record discloses that the amount of control of appellant's business exercised by the Market is such as clearly to show that there is a great deal more than a mere landlord-tenant relationship between them. This vast control, alone, conclusively demonstrates that appellant's business is nothing more than a department being operated in the Market, and not a separate and distinct business.

Since we were prepared to hold that the Act was constitutionally enacted and that appellant's business operations on Sundays were prohibited by it, we passed the *per curiam* order mentioned above.