NORTHAMPTON CORPORATION ᴇᴛ ᴀʟ.
*v.* WASHINGTON SUBURBAN
SANITARY COMMISSION

[No. 79, September Term, 1976.]

*Decided December 7, 1976.*

678

The cause was argued before SINGLEY, SMITH, DIGGES, ELDRIDGE and ORTH, JJ.

*Glenn T. Harrell, Jr.,* and *George A. Brugger,* with whom were *Fossett & Brugger, William E. Knight, Shipley, O'Malley & Miles, Charles G. Dalrymple, David D. Freishtat, Linowes & Blocher, Stephen R. Creyke, Williams, Haynes & Creyke, Richard Schifter, William B. Hoffman* and *Fried, Frank, Harris, Shriver & Kampelman* on the brief, for appellants.

*Paul T. Sisson,* with whom was *J. Eugene Cleary* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This case is a frontal attack mounted by 13 property owners (the Property Owners) against an interim sewer service charge (the Service Charge) imposed by Washington Suburban Sanitary Commission (the Commission).

The Commission is a body corporate, created by Chapter 122 of the Laws of 1918, *see State v. Canova,* 278 Md. 483, 365 A. 2d 988 (1976), and charged with the duty of providing water and sewer service in the Washington Suburban Sanitary District (the Sanitary District), comprising most of Prince George's and Montgomery Counties, which are the Maryland counties contiguous to the District of Columbia.

Commencing in May of 1970, the State Department of Health and Mental Hygiene imposed restrictions on new sewer connections, as did the Commission itself, as a result of the overtaxing of sewage treatment facilities. These restrictions, usually referred to as the "sewer moratorium," severely curtailed new residential and commercial construction in the Sanitary District. A detailed discussion of the problems created by the moratorium appears in *Smoke Rise, Inc. v. Washington Suburban San. Com'n*, 400 F. Supp. 1369 (1975).

In connection with the imposition of the moratorium, the State instructed the Commission to undertake the expansion of existing sewage treatment and transmission facilities and to embark on a program of constructing new facilities.

Because of the time required to expand existing facilities and to construct new permanent facilities and the depressed condition of the construction industry resulting from the moratorium, the Commission in March, 1975 turned to the construction of "interim" sewage treatment plants: less costly plants of limited capacity, with a projected useful life of five to 10 years.

Three interim sewage treatment plants are being built, with projected capacities of between one and three million gallons per day. Two are in Montgomery County, in the Seneca and Horsepen Drainage Basins. One is in Prince George's County, in the Anacostia Basin. The Commission has reserved 20% of the capacity of the Seneca plant for the relief of the Cabin John Basin and one-half of the capacity of the Anacostia plant for the relief of overflow conditions in the Anacostia Basin.

In order to finance the construction of the interim treatment plants, the Commission, by resolution effective 1 May 1975, adopted a scheme of service charges which would be imposed on all connections to be made to the sewer system in the Sanitary District until adequate permanent facilities are operating.[1]

---

1. We were told at argument that a number of alternative proposals for the financing of the Interim Plants was presented to the Prince George's and Montgomery County Councils and that the Service Charge was selected as the most equitable.

The charges, which are in effect for the entire Sanitary District, except for the area served by the Damascus Sewage Treatment Plant in upper Montgomery County, are fixed as follows:

"(1) A dwelling unit and each separate unit within a multi-dwelling unit, shall be subject to an Interim Sewerage Service Charge of $750.00.

"(2) Single family dwelling units within an apartment building shall be subject to an Interim Sewerage Service Charge of $500.00 per unit.

"(3) All other structures, not otherwise excluded herein, shall be subject to an Interim Sewerage Service Charge based upon $750.00 per each 10 commercial fixture units, subject to a minimum charge of $750.00, and educational institutions, volunteer fire departments, churches and other eleemosynary associations, public service buildings and each trailer space in a trailer camp shall be included herein at $\frac{1}{2}$ the total charge, as applicable.

"(4) The following categories shall be subject to $\frac{1}{3}$ of the Interim Sewerage Service Charge, as applicable.

(a) dwelling units in existence on the effective date of this Resolution.

(b) property where prior commitments have been made and house connections paid, and are under construction as herein defined.

(c) service to properties, as defined in Section A, served by private sewage treatment plants . . ."

Payment of the Service Charge relating to service approved for existing units prior to the enactment of the resolution was to be in full at the time of payment of connection fees. For all other properties for which service had been approved prior to the enactment of the resolution,

one-third to be paid within 60 days of the effective date of the resolution, the balance to be paid when house connection fees are paid or within 12 months of the date when service was approved, whichever is the earlier.

As to service approved by the Commission after the enactment of the resolution, one-third of the charge was to be paid within 60 days of the Commission's approval of the application for service, with the balance payable upon payment of house connection fees or within 12 months from the date of approval of service, whichever is the earlier.

In June and July of 1975, the Property Owners filed bills of complaint in the Circuit Court for Prince George's County, seeking interlocutory and permanent injunctions prohibiting the Commission from collecting the Service Charge. Interlocutory injunctions were issued pending consideration of the cases on their merits. The cases were consolidated for purposes of trial, and after a hearing, the chancellor (Couch, J.) upheld the levying of the Service Charge and denied injunctive relief. The Property Owners noted an appeal to the Court of Special Appeals. We granted certiorari before the case was heard in that court.

The Property Owners assert that there are six reasons why they should have been granted the relief which they prayed. We shall consider each of them.

(i)

The Commission exceeded its statutory authority in attempting to finance capital construction projects by the imposition of a Service Charge.

This argument focuses on two chapters of the Washington Suburban Sanitary District Code (1970) (the WSSD Code), codified by Chapter 115 of the Laws of 1971: Chapter 4, "Bonds and Anticipation Notes Generally," and Chapter 6, "Rates and Charges Generally."

Section 4-1 (a) is a broad grant of authority for the issuance of bonds,

"For the purpose of providing funds for the design, construction, reconstruction, establishment, ex-

tension, enlargement, purchase or condemnation of the water, sewerage and drainage systems in the sanitary district . . . ."

Section 4-10 (a) deals specifically with the issuance of bonds for trunk sewers, pumping stations and sewage disposal facilities.

In imposing the Service Charge, the Commission acted under Chapter 6 of the WSSD Code. Section 6-1 empowers the Commission to make reasonable and uniform connection charges. Section 6-3 (a) permits the creation of subdistricts where

"[T]he conditions for service from any of its systems, including the financial aspect of instituting and maintaining such service, are substantially different from those obtaining generally in the sanitary district . . . ."

and provides for a nonuniform rate or charge.

The Property Owners argue that the WSSD Code mandates that capital construction be financed only by the issuance of bonds and bond anticipation notes, and not by the imposition of a service or special connection charge under Section 6-1.

Further, they argue that the Commission has distorted the provisions of Section 6-3 by in effect making almost the entire Sanitary District a subdistrict in order to escape the requirement of uniformity.

The trial court did not take such a restrictive view of the matter and neither do we. There are obvious reasons why a facility with a projected useful life of from five to 10 years should not be financed by a long-term borrowing. Additionally, we are satisfied that the Commission has authority under Section 6-1 to impose a connection charge which reflects any "extraordinary expense in the maintenance and operation of the . . . sewerage . . . [system] under its control."

Nor are we impressed by the argument that there was a distorted application of the provisions of Section 6-3. The

Commission created one class of properties comprised of properties the owners of which had approvals for sewer service which could not be provided because of the moratorium on the one hand, and of properties where the owners' applications for sewer service could not be granted in the future on the other, without the additional capacity provided by the interim treatment plants. A schedule of uniform charges was adopted for virtually the entire Sanitary District.

(ii)

> The Service Charge as applied to the Property Owners violates Maryland law because it constitutes a special assessment levied upon persons who receive no special benefit from the public improvements so funded.

This argument, while applicable to a special or benefit assessment, where a separate levy is imposed on selected properties, *VFW v. Montgomery County*, 207 Md. 442, 448 [*Silver Spring Memorial Post v. Montgomery County*], 115 A. 2d 249, 251 (1955) has no relevance to this case.

The notion that because the properties involved may not be served by the interim facilities the owners should not be required to pay the Service Charge overlooks the fact that the Property Owners are specially benefited by being permitted to make the sewer connections which have been denied them heretofore.

Our cases make it abundantly clear that so long as similarly situated properties are similarly treated under a definite and just plan adopted by governmental authorities in the exercise of their discretion, the action will not be disturbed by the courts where neither fraud nor mistake appears, *Leonardo v. County Comm'n*, 214 Md. 287, 134 A. 2d 284 (1957), *cert. denied*, 355 U. S. 906 (1957), *reh. denied*, 355 U. S. 967 (1958). This rule has been followed in *Montgomery County Council v. Summers*, 274 Md. 110, 332 A. 2d 646 (1975); *Somerset County Sanit. v. Chamberlin*, 254 Md. 630, 255 A. 2d 290 (1969); *Beauchamp v. Somerset County*, 243 Md. 98, 220 A. 2d 135 (1966). We regard *Weber Basin Home*

*Builders Ass'n v. Roy City*, 26 Utah 2d 215, 487 P. 2d 866 (1971), relied on by the Property Owners, as inapposite, because that case struck down as discriminatory the increase in the cost of a building permit from $12.00 to $112.00 when it was shown that the increase was intended to supplement municipal revenues and bore no relation to the expense involved in issuing the permit.

(iii)

The imposition of the Service Charge on the Property Owners contravenes prior commitments by the Commission to provide public sewer service to their properties.

At a time prior to the imposition of the Service Charge, certain of the Property Owners had obtained authorizations for sewer service, subject to conditions which were met, and to the payment of charges, which were paid. They argue that a contract was formed between them and the Commission, relying on *Merryman v. Baltimore*, 153 Md. 419, 427, 138 A. 324, 328 (1927) and *Farmer v. Jamieson*, 31 Md. App. 37, 354 A. 2d 225 (1976).

Assuming, arguendo, that such was the case, the contracts became incapable of being performed because of the intervention of the sewer moratorium, which was a valid exercise of the state's police power, *Smoke Rise, Inc. v. Washington Suburban San. Com'n, supra*, 400 F. Supp. at 1383. *See Warren v. Board of Appeals*, 226 Md. 1, 14, 172 A. 2d 124, 129 (1961); *Allied American Co. v. Comm'r*, 219 Md. 607, 616-17, 150 A. 2d 421, 427 (1959); *Walker v. Talbot County*, 208 Md. 72, 87, 116 A. 2d 393, 401 (1955); *Blum v. Engelman*, 190 Md. 109, 57 A. 2d 421 (1948); *Loughran Co. v. Candy & Tobacco Co.*, 178 Md. 38, 12 A. 2d 201 (1940). The short of it is that "it may be stated that under the police power statutes may be enacted which have the effect of terminating existing contracts by forbidding further performance." 17 Am. Jur.2d *Contracts* § 171 (1964).

(iv)

The Service Charge violates the Property Owners'

, constitutional due process rights in that it is impermissibly vague as regards the duration of the applicability of the charge, how any alleged benefits from paying the charge will be apportioned. to payors, and where revenues from the charge will be expended.

We have held that the due process clause of the Fourteenth Amendment to the Constitution of the United States and Article 23 of Maryland's Declaration of Rights have the same meaning and effect with regard to the exaction of property, *Bureau of Mines v. George's Creek*, 272 Md. 143, 156, 321 A. 2d 748, 755 (1974), and that decisions of the Supreme Court in Fourteenth Amendment cases are practically direct authorities, *Allied American Co. v. Comm'r, supra*, at 616.

The principal thrust of the Property Owners' argument is directed at definition A(8), contained in the Commission's resolution, which measures the duration of the period within which the Service Charge may be imposed:

"Interim period includes the period of time between the effective date of this Resolution and the completion and successful operation of (a) the expanded and improved permanent sewage treatment facilities owned and operated by the [Commission], (b) the expansion and improvements to the Blue Plains Sewage Treatment Plant operated by the District of Columbia, and (c) the construction of additional advanced wastewater treatment facilities, including delivery systems appurtenant thereto."

They seem to think that the three conditions make the provision so vague that men of common intelligence must guess at its meaning, relying on *Cramp v. Board of Public Instruction*, 368 U. S. 278 (1961) and *Richards Furniture v. Board*, 233 Md. 249, 196 A. 2d 621 (1964).

We do not see it quite that way. To us, the definition means that the Service Charge will continue to be imposed until permanent sewage treatment facilities have caught up

with the demand for sewer service, and the interim treatment plants can be shut down.

As our predecessors noted in *Richards, supra,* 233 Md. at 264,

"... [W]e do not find the statute vague or indefinite in a constitutional sense. It is unnecessary to elaborate upon this point in great detail. The Act is couched in plain and simple language, which may be easily understood by persons of ordinary intelligence. This is all that is required of a statute in order to prevent it from being vague and indefinite in a constitutional sense. *United States v. Alford,* 274 U. S. 264 [(1927)]; *Connally v. General Const. Co.,* 269 U. S. 385 [(1926)], and the Note 'The Void-For-Vagueness Doctrine in the Supreme Court,' 109 Penn. L. Rev. 67."

Nor do we regard as fatal the failure to disclose the possibility that as much as $10,000,000.00 of the $30,000,000.00 which the Commission expects the Service Charge to produce will not be expended on the interim plants. As we understand it, the $10,000,000.00 will be expended for distribution and transmission lines to be temporarily used by the interim plants, at least parts of which will be incorporated into the permanent system when the interim plants are closed.

(v)

The Service Charge violates the Property Owners' constitutional equal protection rights in that it makes arbitrary and unreasonable distinctions between members of the same class of property owners.

The Property Owners seek to buttress their argument that their rights under the equal protection clause of the Fourteenth Amendment were violated when the Commission, after imposing the Service Charge on a class which consisted of all property owners who receive sewer service authorizations, or who request sewer

connections under pre-existing authorizations, between 1 May 1975 and the end of the interim period, proceeded to subdivide the class in an arbitrary fashion.

They point to the fact that users of the Commission's system in areas which will be served by the interim plants pay no service charge, even if they increase their usage, so long as they add no new toilet facilities.

Further, a property owner who builds a new house on a vacant lot pays the full service charge, while the owner of an existing house with a failing septic system pays one-third of the service charge when he connects to the system.

Churches, public service buildings, educational institutions, volunteer fire departments, eleemosynary institutions and individual trailer spaces pay one-half of what a comparable business or commercial user would pay.

The Commission counters with the argument that while the charge is directed at new users of its system, a citizen forced to abandon a septic tank is entitled to some credit for the investment which he has made, in an effort to alleviate the overburdened public facilities, and finally that WSSD Code Section 6-5 extends preferential treatment to charitable institutions, public buildings and fire departments as regards sewer usage charges.

It seems to us that the Commission must be allowed reasonable latitude in making these subclassifications, and that in the absence of a showing of arbitrariness or bad faith — and the trial court found that there was none here — that part of its resolution should not be disturbed, *Baltimore Country Club v. Comptroller*, 272 Md. 65, 75-76, 321 A. 2d 308, 314 (1974); *Hooks v. Comptroller*, 265 Md. 380, 388-90, 289 A. 2d 332, 336-37 (1972); *Villa Nova v. Comptroller*, 256 Md. 381, 388-89, 260 A. 2d 307, 310-11 (1970). *Compare, Beauchamp v. Somerset County*, 256 Md. 541, 549-50, 261 A. 2d 461, 464-65 (1970).

(vi)

The trial court erred in not permitting certain of the Property Owners to offer as evidence portions of the deposition of Stephen Profilet, the director of the Commission's project planning department.

The properties owned by certain of the Owners are located within the Cabin John Basin, the sewage from which is treated at the Blue Plains Plant owned by and located in the District of Columbia. The purpose of offering the deposition was to show that Blue Plains had the required capacity, that the Owners' inability to connect to the system was the lack of capability of existing transmission lines to transport the flow, that this would be alleviated by the construction of the Dulles Interconnector and not by the construction of the interim plants.

The appellants cite Maryland Rule 413 a 2:

"Maryland Rule 413. Deposition — Use

a. *When May Be Used.*

At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, applied as though the witness were there present and testifying may be used in accordance with any one of the following provisions:

1. * * *

2. By Adverse Party.

The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, managing agent or a person designated under Rule 405 b to testify on behalf of a public or private corporation, partnership, association or governmental agency which is a party may be used by an adverse party for any purpose."

Because Mr. Profilet was not an officer, director or managing agent of the Commission, nor a person designated under Rule 405 b to testify on behalf of the Commission, the

trial court declined to admit the deposition. We agree with this ruling. Additionally, under the view we take of the case, Mr. Profilet's deposition would have been of questionable relevance.

*Order affirmed; costs to be paid by appellants.*