ROBERT T. FOLEY COMPANY ET AL. *v.* WASHINGTON SUBURBAN SANITARY COMMISSION ET AL.

[No. 90, September Term, 1977.]

*Decided July 14, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Barbara A. Sears,* with whom were *Charles G. Dalrymple* and *Linowes & Blocher* on the brief, for appellants.

*J. Eugene Cleary* for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

This case concerns the validity of sewer service charges levied upon the developers of a Montgomery County subdivision by the Washington Suburban Sanitary Commission.

The Washington Suburban Sanitary Commission, created by the General Assembly in 1918, is a public body providing water and sewer services in Montgomery and Prince George's Counties, Maryland.[1] In 1970, however, the Commission's sewage treatment facilities had become critically overtaxed. This crisis led to the imposition of moratoria on sewer connections in several areas of Prince George's and Montgomery Counties. These moratoria, in general, banned the authorization of all new sewer connections until such time as sufficient treatment facilities for sewage became available.

In response to this problem, the Commission initiated the planning and construction of new, permanent sewage treatment facilities. However, the length of time required to construct permanent facilities was substantial. Consequently, the Commission in 1975 adopted its Interim Sewage Treatment Program, Resolution No. 75-278. This program was designed to provide interim relief from the sewer crisis by the construction of temporary sewage treatment facilities to be used until the proposed permanent facilities became available. The program was to be financed by the establishment of an Interim Sewerage Service Charge, applicable to all new connections to the public sewer system. This charge revised the then existing schedule of charges for sewer services.

Prior to 1975, sewer hook-up charges included "subdistrict" charges, levied in accordance with § 6-3 (a) of the Washington Suburban Sanitary District Code, which provides:

"(a) If the commission finds and determines that in any area or subdistrict of the sanitary district the conditions for service from any of its systems, including the financial aspect of instituting and maintaining such service, are substantially different from those obtaining generally in the sanitary

1. For discussions of the Commission's history, status and functions, *see, e.g.,* Northampton Corp. v. Wash. S. S. Comm'n, 278 Md. 677, 366 A. 2d 377 (1976); State v. Canova, 278 Md. 483, 365 A. 2d 988 (1976); Neuenschwander v. Wash. San. Com., 187 Md. 67, 48 A. 2d 593 (1946); Smoke Rise, Inc. v. Washington Suburban San. Com'n, 400 F. Supp. 1369 (D. Md. 1975).

district, the commission may define such area or subdistrict and provide for a different rule, regulation, rate or charge to apply therein, notwithstanding any other provisions of this section otherwise requiring said rule, regulation, rate or charge to be uniform throughout the sanitary district."

In 1975, the various subdistrict charges were replaced by the Interim Sewerage Service Charge: "Subdistrict charges, as now applicable in the Sanitary District, shall be merged into and become a part of the Interim Sewerage Service Charge as applicable herein. . . ." Resolution No. 75-278. The charges established by this resolution were as follows:

"(1) A dwelling unit and each separate unit within a multi-dwelling unit, shall be subject to an Interim Sewerage Service Charge of $750.00.

"(2) Single family dwelling units within an apartment building shall be subject to an Interim Sewerage Service Charge of $500.00 per unit.

"(3) All other structures, not otherwise excluded herein, shall be subject to an Interim Sewerage Service Charge based upon $750.00 per each 10 commercial fixture units, subject to a minimum charge of $750.00, and educational institutions, volunteer fire departments, churches and other eleemosynary associations, public service buildings and each trailer space in a trailer camp shall be included herein at ½ the total charge, as applicable.

"(4) The following categories shall be subject to ½ of the Interim Sewerage Service Charge, as applicable.

(a) dwelling units in existence on the effective date of this Resolution.

(b) property where prior commitments have been made and house connections paid, and are under construction as herein defined.

(c) service to properties, defined in Section A, served by private sewage treatment plants . . . ."

It is the attempted application of this charge to a subdivision in Montgomery County known as Quail Valley which gives rise to this litigation.

The developers of Quail Valley, desiring sewer service for their properties, filed in 1970 applications with the Washington Suburban Sanitary Commission for authorizations to extend existing water and sewer lines to the Quail Valley subdivision. The Commission approved these applications subject to the fulfillment by Quail Valley of certain specified conditions.[2] These conditions included, *inter alia*, the payment by Quail Valley of a portion of the capital cost of extending the water and sewer lines, recordation of plats, grading of streets, and the submission of various construction plans. In addition, the Commission's authorizations provided:

"The property for which service is requested lies within the Upper Montgomery County sewerage subdistrict and is subject to the special connection charges as is approved for such district. Special charges are contained in the subdistrict information sheet enclosed for your information. Subdistrict charges will be paid to our Plumbing Division at the time of filing the regular house connection applications."

The subdistrict charges for the Upper Montgomery County sewerage subdistrict were $300.00 at the time the Commission issued its authorizations to Quail Valley. By 1973, Quail Valley had complied with the conditions set forth in the Commission's authorizations. In addition, it had paid the $300.00 subdistrict fee for each of the proposed units in the development. Thereafter, the Commission extended water

---

2. The Quail Valley subdivision is situated in the Seneca Basin. The Moratoria on new authorizations for sewer service in the Seneca Basin were not finally implemented until 1973. Hence, sewer service to the subdivision was not precluded by these moratoria.

and sewer lines through the newly graded streets of Quail Valley and stubbed all connections from these lines to the property line of each lot. As construction of each unit was completed, the prior authorization was implemented, and the plumbing of the completed unit was hooked up to the existing connection.

In May 1975, some five years after its initial authorization, 319 of the 593 proposed units of the Quail Valley subdivision were neither "in existence or under construction" as defined in the Interim Sewage Treatment Program, and were therefore subject to the Interim Sewerage Service Charge by the terms of the program. The Commission refused to process necessary permits for these new units until the Quail Valley developers paid the Interim Sewerage Service Charge ($750.00 less a credit of $300.00 paid in subdistrict fees).

The developers paid the new charges under protest, and then filed a bill of complaint in the Circuit Court for Montgomery County, for declaratory and injunctive relief. They sought (1) a declaration that the resolutions establishing the Interim Sewerage Service Charge were invalid on various grounds, including the contention that the resolutions impaired a contractual obligation owed by the Commission to the developers, and (2) an injunction restraining the Commission from collecting the Interim Sewerage Service Charge and directing the Commission to return all such charges paid under protest. Both parties then filed motions for summary judgment.

Before the circuit court rendered a decision, this Court handed down *Northampton Corp. v. Wash. S. S. Comm'n,* 278 Md. 677, 366 A. 2d 377 (1976). In *Northampton,* we upheld the Commission's Resolution No. 75-278 and the imposition of the Interim Sewerage Service Charge against a variety of attacks, constitutional and otherwise. Specifically, we upheld the imposition of the Interim Sewerage Service Charge upon properties where the owners had, prior to Resolution No. 75-278, obtained authorizations for sewer connections and paid the required charges then in effect, 278 Md. at 685.

Following our decision in *Northampton,* the circuit court in the instant case granted the Commission's motion for

summary judgment, holding that *Northampton* was controlling. The developers then took an appeal to the Court of Special Appeals, and prior to any proceedings in that court we granted the Commission's petition for a writ of certiorari.

Although not clearly defined and separated in their brief, the developers of Quail Valley appear to mount a two-pronged constitutional attack upon the imposition of the Interim Sewerage Service Charge on their properties: (1) a substantive due process argument, namely that the action of the Commission is not a valid exercise of the police power and thus deprives the developers of property rights without due process of law in violation of the Fourteenth Amendment; (2) a Contract Clause argument, to the effect that the developers had obtained a contractual right to receive sewer service at the rates specified by the Commission prior to the adoption of the Interim Sewerage Service Charge, and that the attempt by the Commission to impose the interim rates impairs the obligation of this contract in violation of the United States Constitution, Art. I, § 10, cl. 1. The developers acknowledge that our decision in *Northampton* would be dispositive of these contentions if the facts of this case were not materially different from the facts there, and they expressly "do not challenge any of the . . . holdings" in *Northampton.* However, they seize upon the one distinguishing factor between *Northampton* and the present case. In *Northampton,* the sewer moratoria were applicable to the properties for which authorizations for sewer service had been obtained prior to the adoption of Resolution No. 72-278 and its imposition of the Interim Sewerage Service Charge. On the other hand, the moratoria were not specifically applicable to the authorizations for the Quail Valley subdivision, and sewer service to the properties here involved was not legally precluded by any particular sewer moratorium order itself. This distinction, it is contended, is constitutionally significant and warrants a different result.

In addition to their constitutional contentions, the developers of Quail Valley also argue that the circuit court erred in not rendering a declaration of the rights of the parties as required under the Declaratory Judgments Act,

Maryland Code (1974, 1977 Cum. Supp.), §§ 3-401 — 3-415 of the Courts and Judicial Proceedings Article.

### (1)

### *Due Process*

As the Supreme Court reiterated just last month, "it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a "superlegislature to weigh the wisdom of legislation"....' *Ferguson v. Skrupa,* 372 U. S. 726, 731 ...." *Exxon Corp. v. Governor of Maryland,* 437 U. S. 117, 124, 98 S. Ct. 2207, 2213, 57 L.Ed.2d 91 (1978). The pertinent principles were recently set forth by us in *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 426-427, 384 A. 2d 748, 751 (1978), and again in *Montgomery County v. Fields Road Corp.,* 282 Md. 575, 583, 386 A. 2d 344, 348-349 (1978):

> "A large discretion is necessarily vested in the legislature to determine what the welfare of the public requires and what measures are necessary to promote it. . . . The wisdom or expediency of a law adopted in the exercise of the State's police power is not subject to judicial review and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. . . . In other words, to be able to find fault with a law is not to demonstrate its invalidity; it may seem unjust, yet be free from judicial interference. . . .
>
> "In the exercise of the police power the State may lawfully impose such burdens and restraints on private rights as may be reasonably necessary and proper to secure the general welfare. . . . The due process clause does not, therefore, inhibit a State from insisting that all contract and property rights are held subject to the constitutional exercise of the police power. . . .
>
> "A statute enacted under the police power carries with it a strong presumption of constitutionality and

the party attacking it has the burden of affirmatively and clearly establishing its invalidity; a reasonable doubt as to its constitutionality is sufficient to sustain it. . . . In other words, the legislature is presumed to have acted within constitutional limits so that if any state of facts reasonably can be conceived that would sustain the constitutionality of the statute, the existence of that state of facts as a basis for the passage of the law must be assumed. . . ."

See also *Westchester West No. 2 v. Mont. Co.,* 276 Md. 448, 348 A. 2d 856 (1975); *Steuart Petroleum Co. v. Board,* 276 Md. 435, 347 A. 2d 854 (1975), and cases there cited.

Considering the extremely limited role of a court in reviewing legislative acts on substantive due process grounds, we cannot conclude that Resolution No. 75-278, as applied to Quail Valley, is invalid on this ground. The importance and severity of the sewer crisis in Prince George's and Montgomery Counties is well documented. *See, e.g., Northampton Corp. v. Wash. S. S. Comm'n, supra; Smoke Rise, Inc. v. Washington Suburban Commission,* 400 F. Supp. 1369 (D. Md. 1975). The moratoria on new sewer authorizations were necessary to prevent the increasing discharge of raw and inadequately treated sewage into the waters of the State. On the other hand, since the time needed to construct permanent sewage treatment facilities was substantial, the continuing adverse effect of the various sewer moratoria was becoming a matter of increasing concern. For example, the construction industry in Prince George's and Montgomery Counties came to a virtual standstill. *Northampton Corp. v. Wash. S. S. Comm'n, supra.* 278 Md. at 680. Thus, the Commission, after extensive public hearings, found and determined "that the present and increasing need for sewer service of various communities within the Sanitary District ... [had] become a matter of public necessity requiring implementation of an Interim Sewage Treatment Program." Resolution 75-278.

As previously indicated, Quail Valley relies upon the fact that its authorizations for sewer service were not precluded

by the moratoria. The developers contend that the properties involved in *Northampton* received a benefit from the Interim Sewerage Service Charge, because those additional charges relieved the properties from the effects of the moratoria, whereas Quail Valley, not being subject to the sewer moratoria, does not need the interim sewage treatment plants and thus receives no benefit from the increased charges to construct the plants.

However, this same argument has been repeatedly rejected by the courts as a basis for invalidating governmental action under the Fourteenth Amendment. In *Valley Farms Co. v. Westchester County,* 261 U. S. 155, 43 S. Ct. 261, 67 L. Ed. 585 (1923), the Court upheld a charge against property for sewer construction despite the claim that the assessment against petitioner's property to pay for trunk sewer and outlet sewers, which would in no way benefit the property, amounted to a deprivation of property rights without due process of law. The Court relied, *inter alia,* on *Miller & Lux v. Sacramento Drainage District,* 256 U. S. 129, 130, 41 S. Ct. 404, 65 L. Ed. 859 (1921), where it was stated that

> "the doctrine has been definitely settled that in the absence of flagrant abuse or purely arbitrary action a state may establish drainage districts and tax lands therein for local improvements, and that none of such lands may escape liability solely because they will not receive direct benefits."

*See also Houck v. Little River Drainage Dist.,* 239 U. S. 254, 36 S. Ct. 58, 60 L. Ed. 266 (1915); *Dinneen v. Rider,* 152 Md. 343, 364-365, 136 A. 754 (1927).

Although the above cases are dispositive of the developers' substantive due process argument, it should be noted that the sewer crisis is not fragmented into a series of independent, local problem areas. In Resolution No. 76-333, a resolution enacted by the Commission to clarify certain aspects of the Interim Sewage Treatment Program, it was stated, with regard to the sewer crisis:

> " . . . [T]he early discussions, no less than those which continued in the ongoing concern of the WSSC

and the Montgomery and Prince George's Counties governing bodies, recognized the interrelationship and mutual dependency of the collection and treatment systems in the various basins of the Washington Suburban Sanitary District, which included such factors as 'pump over' operations from the natural Western Branch basin to the sewage collection system in the Anacostia Basin tributary to the Blue Plains Treatment Plant, the existence of two pumping stations which permits transferral of some sewage between the Anacostia Basin and the Parkway Treatment Plant system, the pumping back-and-forth capability (albeit limited) between portions of the Piscataway drainage basin and the aforementioned system which leads to Blue Plains with respect to Prince George's County segments of the WSSC, and including, also, the aspects of transferral (pumping capability) affecting the Rock Creek, Cabin John and Muddy Branch systems (in Montgomery County), which in turn affects the Seneca sub-basin in that County, *inter alia;* . . .

\* \* \*

" . . . [T]he establishment and institution of **temporary or interim treatment facilities** . . . irrespective of drainage basin location, would have an effect on . . . opportunities for new sewer service . . . in the other basins of the WSSC . . . ."

The developers of Quail Valley do not contest the accuracy of this description. Thus, in light of the comprehensive character of the problem faced by the Commission, the solution of an Interim Sewage Treatment Program, financed by a uniformly levied charge, would clearly seem reasonable in the circumstances. Consequently, the Interim Sewerage Service Charge is not unconstitutional on substantive due process grounds.

## (2)

### Contract Clause

In *Northampton Corp. v. Wash. S. S. Comm'n, supra,* in rejecting the argument of property owners having prior sewer service authorizations that Resolution No. 75-278 impaired contracts between them and the Commission, this Court did assume arguendo that contracts may have been created. We relied on a theory that, because the sewer moratoria applied to the properties in question, such contracts were incapable of being performed, 278 Md. at 685. Because the authorizations involved in the present case were not subject to a specific sewer moratorium order, the developers of Quail Valley correctly argue that the theory invoked in *Northampton* is not applicable here. Nevertheless, this does not mean that a different result should obtain.

The Supreme Court has recently made it clear that the Contract Clause does "impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Company v. Spannaus,* U. S., 98 S. Ct. 2716, 2721, 57 L.Ed.2d 727 (1978). Consequently, our conclusion that Resolution No. 75-278 represents a valid exercise of the police power, although pertinent, does not in itself answer the contention that contract rights were unconstitutionally impaired.

Consideration of a claim that particular governmental action invalidly impairs contractual obligations involves several steps. *See United States Trust Co. v. New Jersey,* 431 U. S. 1, 17-21, 97 S. Ct. 1505, 52 L.Ed.2d 92 (1977). First, it must be determined whether a contract existed. If that hurdle is successfully cleared by the claimant, a court next must decide whether an obligation under that contract was changed. Finally, if the second question is answered in the affirmative, the issue becomes whether the change unconstitutionally impairs the contract obligation, "[f]or it is not every modification of a contractual promise that impairs the obligation of contract under federal law . . . ." *City of El*

*Paso v. Simmons,* 379 U. S. 497, 506-507, 85 S. Ct. 577, 582-583, 13 L.Ed.2d 446 (1965).

Moreover, in performing this analysis, the context in which the Contract Clause claim is made and the various characteristics involved in the particular case, become critically important. *Allied Structural Steel Company v. Spannaus, supra,* U. S. ; *United States Trust Co. v. New Jersey, supra.* As Judge Bartol stated for this Court long ago, "[i]n considering the rights, powers and liabilities of public ... [bodies], in respect to contracts made by them, regard must be had to the subject matter to which such contracts relate, and the character in which the ... [public] body acts in making them." *Rittenhouse v. Baltimore,* 25 Md. 336, 346 (1866).

With regard to the type of case now before us, that is a public agency providing a governmental benefit such as furnishing water, sewer or other utility service, and levying a particular rate or charge for that service, and at least where there are no other factors suggesting that the government intended to bind itself to the amount of that charge, courts have normally been reluctant to find that the beneficiary of the government action has any type of vested contract right protecting him from reasonable increases in the amount of the rate or charge prior to the time that the service is ultimately rendered. *See, e.g., John P. King Mfg. Co. v. City Council of Augusta,* 277 U. S. 100, 114-115, 48 S. Ct. 489, 72 L. Ed. 801 (1928); *Yeatman v. Public Service Com.,* 126 Md. 513, 518-519, 95 A. 158 (1915); *Lamar Bath House Co. v. City of Hot Springs,* 229 Ark. 214, 315 S.W.2d 884 (1958); *City of Covington v. Sanitation District No. 1,* 301 S.W.2d 885 (Ky. 1957); *Levine v. The Long Island Railroad Company,* 38 A.D.2d 936, 331 N.Y.S.2d 451, *aff'd,* 30 N.Y.2d 907, 335 N.Y.S.2d 565, 287 N.E.2d 272, *cert. denied,* 409 U. S. 1040, 93 S. Ct. 525, 34 L.Ed.2d 490 (1972); *State v. Taylor,* 149 Ohio St. 427, 79 N.E.2d 127 (1948); *American Aniline Products v. City of Lock Haven,* 288 Pa. 420, 135 A. 726 (1927).

The reasoning in these cases varies somewhat. Some decisions rest on the theory that even if a contract were

intended, it would be ultra vires and against public policy as an effort by the governmental body to bargain away its police power, *e.g., Lamar Bath House Co. v. City of Hot Springs, supra,* 315 S.W.2d at 887. Others take the position that the right of a state to alter a rate schedule is inherent, and contracts are made subject to this power, *e.g., Levine v. Long Island Railroad Company, supra,* 331 N.Y.S.2d at 455. A governmental impairment (if any) in a contract with utility customers has been justified as necessary in the "exercise of [the] power to protect the health of the community," *City of Covington v. Sanitation District No. 1, supra,* 301 S.W.2d at 889. Still other cases have viewed the governmental approval of applications for water and sewer service as ordinarily not being intended to create binding contractual rights but giving rise to mere licenses, *e.g., Williams Bros. Pipe Line Co. v. City of Grand Forks,* 163 N.W.2d 517, 519 (N.D. 1968).[3]

This last approach received this Court's recognition in *Yeatman v. Public Service Com., supra.* Although that case involved a claim that governmental action approving an increase in rates impaired a contract between utility customers and a private water company, this Court, in holding that no impairment existed, pointed out that "cases which have dealt with situations where there had been an establishment of rates directly by the Legislature, have distinctly denied the theory that such legislative establishment of rates constituted any contract whatever . . . ." 126 Md. at 518-519.

In our view, the cases referred to in *Yeatman* appear to represent a sound approach. Where a governmental body establishes fees for furnishing a necessary utility service such as sewers, to protect the health of the public, the approval of an application for service should ordinarily not be considered as creating a binding contract with respect to the amount of the fee for a future connection. Absent some specific indication to the contrary, we do not believe that a

3. It is of course well settled that the award of a license from the State, even for a fee, "is in no sense a contract made by the State with the party holding the license." Fell v. State, 42 Md. 71, 89 (1875).

mere approval of applications, such as existed in the present case, is ordinarily intended to give rise to a contractual obligation prohibiting a reasonable increase in the charge between the date of approval and the date of the sewer connection. This approach is supported by the principle that before governmental action will be held to grant a constitutionally protected contract right, the intent to do this must be expressed in clear and unmistakable language. *St. Louis v. United Railways Co.,* 210 U. S. 266, 28 S. Ct. 630, 52 L. Ed. 1054 (1908); *Slidell v. Grandjean,* 111 U. S. 412, 437-438, 4 S. Ct. 475, 28 L. Ed. 321 (1884); *Fertilizing Co. v. Hyde Park,* 97 U. S. 659, 666, 24 L. Ed. 1036 (1878); *Charles River Bridge v. Warren Bridge,* 11 Pet. 420, 546-548, 9 L. Ed. 773 (1837).

In sum, under the specific circumstances of this case, we hold that Resolution 75-278 did not impair any contract rights of the developers with regard to the increase in charges.

### (3)

### *Declaratory Judgments Act*

Finally, Quail Valley argues that it failed to receive a declaration of its rights in the matters for which declaratory relief was sought. Quail Valley brought its action under the Maryland Uniform Declaratory Judgments Act, Code (1974, 1977 Cum. Supp.), §§ 3-401 — 3-415 of the Courts and Judicial Proceedings Article. Section 3-406 provides that:

> "Any person interested under a deed, will, trust, land patent, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, administrative rule or regulation, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, administrative rule or regulation, land patent, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it."

In its bill of complaint, Quail Valley had requested, *inter alia,* the court to declare "Resolutions 75-278 and 76-333 to be invalid because ... they violate a previous contractual obligation which the WSSC owes to the Plaintiffs." The circuit court did not deal with this question. The court merely stated in an oral opinion that "the *Northampton Corporation* case is controlling." The court's decree said nothing regarding the merits of the case, reciting only that the defendant's motion for summary judgment was granted and the plaintiffs' motion was denied.

As we stated in *Dart Drug Corp. v. Hechinger Co.,* 272 Md. 15, 29, 320 A. 2d 266 (1974):

> "While a declaratory decree need not be in any particular form, it must pass upon and adjudicate the issues raised in the proceeding, to the end that the rights of the parties are clearly delineated and the controversy terminated."

*See also Logan v. Town of Somerset,* 271 Md. 42, 314 A. 2d 436 (1974); *Reddick v. State,* 213 Md. 18, 130 A. 2d 762, *cert. denied,* 355 U. S. 832, 78 S. Ct. 50, 2 L.Ed.2d 44 (1957).

In the instant case, it is clear that the circuit court erred by failing to set forth in its judgment a declaration of the parties' rights with regard to the issues raised. We shall, therefore, vacate the judgment and remand the case to the circuit court for that court to enter a new judgment which shall include a declaration of the rights of the parties as set forth in this opinion.

> *Judgment vacated.*
>
> *Case remanded to the Circuit Court for Montgomery County for the entry of a judgment in conformance with this opinion.*
>
> *Costs to be paid by the appellants-respondents, Robert T. Foley Company et al.*