495 A.2d 30

**WASHINGTON SUBURBAN SANITARY COMMISSION**

v.

**C.I. MITCHELL AND BEST CO. et al.**

**No. 137, Sept. Term, 1984.**

Court of Appeals of Maryland.

July 17, 1985.

Per Curiam on Motion for Reconsideration
*Filed Sept. 11, 1985.*

Roger D. Redden, Baltimore (Paul A. Tiburzi, Baltimore and Nathan J. Greenbaum, Hyattsville, on brief), for appellant.

Charles G. Dalrymple, Silver Springs (Susan M. Reutershan and Linowes and Blocher, Silver Springs, on brief), for appellees.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and McAULIFFE, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This appeal is from a declaratory judgment invalidating a special connection charge imposed by the Washington Suburban Sanitary Commission (WSSC). We shall affirm that determination, but only after concluding that there is neither any special statutory remedy nor any administrative agency which should exercise primary jurisdiction. There may not be any recovery of the charges paid, however, because of Maryland's stringent voluntary payment rule.

■ WSSC is a creature of statute, originally Ch. 122 of the Acts of 1918. The present version of that statute is Md.Code (1957, 1983 Repl.Vol., 1984 Cum.Supp.), Art. 29.[1] We have held that WSSC is a state agency for purposes of the Administrative Procedure Act. *See Donocam Assocs. v. WSSC,* 302 Md. 501, 510, 489 A.2d 26, 30 (1985); *Prince George's Co. v. Blumberg,* 288 Md. 275, 294–95, 418 A.2d 1155, 1166 (1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981). The agency enjoys sovereign immunity. *See Katz v. WSSC,* 284 Md. 503, 509–12, 397 A.2d 1027, 1031–32 (1979). We have also said that WSSC "had sufficient of '[t]he attributes of a municipal corporation' to bring it within the provision of a statute applicable in certain counties which, as a prerequisite to suit in certain instances, required written notice within 90 days after an injury or damage was sustained." *WSSC v. Pride Homes, Inc.,* 291 Md. 537, 539, 435 A.2d 796, 797–98 (1981) (footnote omitted) (discussing *Neuenschwander v. WSSC,* 187 Md. 67, 48 A.2d 593 (1946)). The mission of the agency includes providing for the construction, operation, and maintenance of water supply, sewerage, and storm drainage facilities in the Washington Suburban Sanitary District (the District), an area encompassing over 950 square miles in Montgomery and Prince George's Counties and containing a population of more than one million. The capital and operating budgets of WSSC are, with limitations, subject to review and approval by the county executives and county councils of the two counties. *See, e.g.,* § 1–204; *Katz, supra,* 284 Md. at 509, 397 A.2d at 1031. As part of the process WSSC is required annually to prepare and present to officials of the two counties a Capital Improvements Program (the CIP). *See* §§ 7–101 through –107. The CIP is "a 6 year projected program of capital improvements for water, sewer, and storm drainage facilities." § 7–101(c).

Historically, WSSC has funded capital expenditures required to support the extension of service lines and the construction of treatment plants, transmission, and storage

---

1. All references to statutes are to current Art. 29 unless otherwise noted.

facilities through long-term debt financing. This investment was recovered through various charges, including charges based upon the extent of use which a customer made of the system. Over the years growth in the District and inflation have greatly increased the amount of bonded indebtedness carried by WSSC, with consequent increases in user charges. Concerned over these increases the county councils of the two counties, while reviewing WSSC's proposed budget for the fiscal year beginning July 1, 1978, directed WSSC to develop and recommend in its next proposed budget alternative approaches for funding the capital costs of providing water and sewer service to new users in the District. In response WSSC adopted, effective July 1, 1979, a new charge, the System Expansion Offset Charge (SEOC). SEOC is a one-time, up front charge paid by a new WSSC customer. SEOC is paid in addition to sewer and water service charges, front foot benefit charges, the preexisting sewer and water connection charges, and subdistrict charges.[2] In that first year the SEOC for a single family dwelling unit was $485 for water and $265 for sewer, or a total of $750. That amount was the same as a then existing Interim Sewer Service Charge (ISSC) which was repealed as part of the adoption of SEOC. During that first year of SEOC a committee largely composed of public officials and businessmen, including particularly home builders, studied SEOC. Although the committee split over whether SEOC should be retained, they agreed that if it were retained, its method of calculation should be modified. WSSC, by resolution effective July 11, 1980, substantially adopted the committee's recommendations. This modified calculation produced an SEOC for single family dwelling units totaling $1,560, apportioned $735 to water and $825 to sewer.

There are two aspects to the SEOC program. The first is the computation of the charge itself. Because we shall conclude that SEOC is facially invalid, this opinion will not

---

**2.** Under § 6–103 WSSC is authorized to depart from the general requirement that rates or charges be uniform throughout the District if it determines that the conditions in a specific area, *i.e.,* a "subdistrict," are substantially different from the conditions for service generally in the District.

deal with the details of that computation.[3] The second aspect of the program offsets debt service from the funds collected under SEOC. The trial judge's very full and helpful opinion describes this calculation.

All SEOC payments are deposited in a separate interest bearing account. An annual transfer is made from this account into the WSSC's operating budget. This transfer is intended to offset debt service in the WSSC's operating budget resulting from the issuance of long term bonds to fund new growth facilities. The amount of this transfer is determined by another multistep mathematical calculation, hereinafter referred to as the "transfer formula".... The coming year's CIP budgeted debt is divided into water and sewer projects; these projects are then divided into those for growth and those for reinforcement; and the amounts attributable to growth are then expressed as percentages of total cost for the year. Next the overall increase in debt service of the WSSC is obtained by subtracting the current year's debt service from the projected debt service for the coming year. The overall increase in debt service is then multiplied by the percentages attributable to growth. This figure is then multiplied by 57% which is the percentage of capital cost of serving a dwelling paid by the SEOC payor ($1,560 is 57% of $2,720, the other 43% is the offset allowance).

---

**3.** In its brief WSSC generally describes the methodology used in calculating SEOC during the period with which we are concerned. WSSC's engineers determined a capital cost to be incurred to provide service to an individual dwelling unit by developing a synthetic water and sewer system, the costs of which were derived from the actual costs of components of WSSC's existing system. For example, the cost of a transmission and collection system was extrapolated from the existing system serving a basin in Laurel. The total cost of this synthesized system was converted into a per dwelling unit cost by dividing the total cost figure by the number of units that each component served; the per unit cost was then divided by the number of gallons of water consumed on the average day by a single unit to arrive at a per unit/per gallon cost. The amount derived from this calculation was in turn reduced by an offset amount, also calculated on a gallonage basis, to cover then-current outstanding debt and assure that the new customer would not, in effect, be paying twice for that debt.

Therefore, the transfer from the SEOC account to the operating budget is only intended to fund 57% of debt related to new growth.

The instant action was brought September 17, 1981, and was certified as a class action. Plaintiffs sought a declaratory judgment invalidating SEOC for want of legal power in WSSC to adopt it, or, if SEOC was authorized, declaring SEOC as adopted to be unreasonable and void. The complaint sought an injunction against future collection. Joining as plaintiffs were a mix of developers who had paid SEOC directly and of purchasers of new homes who had paid their developer's SEOC costs in the purchase prices of their homes. Plaintiffs sought refunds individually and on behalf of a class. In its final judgment the trial court invalidated SEOC for lack of authority in WSSC to adopt it at all and because SEOC, as adopted, was unreasonable in amount. The court enjoined future collections but then stayed the injunction pending this appeal. The circuit judge ordered WSSC to make restitution of SEOC paid after this suit was filed to direct payors of SEOC or, where direct payors had recovered their costs, to the payor's successor in title. The judgment did not order restitution of SEOC paid prior to suit.

WSSC appeals. It urges that an administrative remedy before the Public Service Commission of Maryland (PSC) has not been exhausted; that the action is barred by laches; that the trial court erred in both of its conclusions on the merits; that refunds cannot be ordered in any event; and that the class of plaintiffs was improperly enlarged after the trial had ended.

Plaintiffs cross appeal. They seek to enlarge the recovery of refunds to include SEOC paid prior to the institution of this action.

I

The threshold question is whether the trial court should have entertained this action as one invoking the ordinary general jurisdiction of the circuit court. "This Court has firmly adhered to the rule that statutorily prescribed administrative and judicial review remedies must ordinarily be

pursued and exhausted." *Maryland Comm'n on Human Relations v. MTA*, 294 Md. 225, 230, 449 A.2d 385, 387 (1982). Here we deal with two possible special statutory remedies. WSSC urges that an administrative remedy lies before the PSC. If that remedy is available, it has not been exhausted. Our case law would then require us to vacate the trial court judgment. Such a PSC remedy would also be a "special form of remedy for a specific type of case" precluding a declaratory judgment. *See* Md.Code (1974, 1984 Repl.Vol.), § 3–409(b) of the Courts and Judicial Proceedings Article. Second, because this action seeks a refund of charges collected by a state agency, the action implicates Md.Code (1957, 1980 Repl.Vol.), Art. 81, § 215, the refund statute for public charges imposed by a state agency. A further threshold issue which we shall consider in this part I is whether the trial court should have deferred to the PSC under principles of primary jurisdiction as enunciated in *Maryland-Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 386 A.2d 1216 (1978).

## A

The statutes governing WSSC do not always flow in the mainstream of Maryland administrative law. This is initially demonstrated by the fact that WSSC does not even argue that the plaintiffs had an administrative remedy before that agency. We are nevertheless obliged to notice, on our own initiative, an applicable administrative remedy, if any. Usually if one exists, it is before the agency involved in the challenged agency action. But here we find in Art. 29 no such remedy on application to WSSC with respect to the issues raised by the plaintiffs.

WSSC's exhaustion of administrative remedies argument rests on § 6–110 which provides:

(a) On the written complaint of an individual who has a financial interest in the appeal, or on the written complaint of the County Council of Montgomery County or Prince George's County, and under the rules and regulations of the Public Service Commission, the Public Service Commission on appeal shall determine the reasonableness

of any assessment, tax, levy, or service charge of the WSSC.

(b) The appeal must be taken within 30 days of the date on which the WSSC made the assessment, tax levy, or service charge.[1]

This statute, in substantially its present form, dates back to the creation of WSSC. *See* Ch. 122, § 22 of the Acts of 1918.

■ Section 6–110 cannot be a general refund statute in light of the requirement that the appeal to the PSC be taken within 30 days from the date on which WSSC made the assessment, tax levy, or service charge complained of. Further, the terms of § 6–110(a), authorizing the PSC only to "determine the reasonableness" of a WSSC service charge, do not seem on their face to embrace the issue of whether WSSC had statutory power to impose SEOC. Nor can we, at this date, construe those terms in § 6–110(a) to authorize a PSC determination of this challenge to WSSC's power to adopt SEOC. From the beginning of WSSC, interpretations of this provision by the PSC and by the Attorney General have excluded from the statutory grant authorization in the PSC to determine WSSC's authority to adopt challenged charges. There have also been repeals and reenactments by the General Assembly of the statute, but they have done nothing to enlarge the restrictive administrative interpretation.

On February 2, 1926, Attorney General Thomas H. Robinson opined on the "scope of the jurisdiction" of the PSC on appeals from WSSC under the 1918 statute. 11 Op.Att'y Gen.Md. 253 (1926). One of the complaints pending before the PSC which prompted the request for an Attorney General's opinion had been filed by residents of Hyattsville who argued that a proposed WSSC $32 connection charge violated specified sections of the 1918 statute and also violated an agreement between WSSC and the municipality of Hyatts-

---

4. No rules of the PSC dealing specifically with appeals from WSSC under § 6–110 are published in the Code of Maryland Regulations.

ville. *Steele v. WSSC,* XVII PSC Md. 64, 65 (1926). The Attorney General advised the PSC that WSSC

> is the executive body with power and authority to fix and establish rates and charges while your Commission has merely the power and authority to determine whether or not, they are reasonable. The two powers are quite distinct. It is easy to imagine a situation wherein a charge fixed by [WSSC] would be a different one from that which your Commission would have fixed had it the original rate making power, but still be a reasonable one. If upon appeal your Commission found this to be the case, it would be obliged to leave the rate undisturbed.
>
> It, therefore, follows that the power of your Commission is limited to deciding whether or not what might be termed basic rates, that is, the charge per front foot, the charge per hundred gallon, the charge for connections in a given district or zone are reasonable, and does not embrace the right to determine whether or not specific charges in specific instances are justly made.
>
> For example, in one of the cases in question it is contended that certain residents of Hyattsville should not be made to bear a $32.00 per connection charge. *It is not within your jurisdiction to pass upon the legality of the charge, but simply to determine whether or not under the circumstances, $32.00 is a reasonable amount. Likewise it is not for your Commission to pass upon the authority of [WSSC] to raise the front foot charge from 10c to 13c, but merely to decide upon the reasonableness of the new rate.* [11 Op.Att'y Gen.Md. at 254 (emphasis added).]

Following receipt of the foregoing opinion, the PSC dismissed its then pending complaint. It reasoned that the complainants

> offered no testimony to show that the proposed charge, if lawfully made, would be an unreasonable amount. It is true that the complainants aver that the proposed charge is unreasonable because discriminatory, but the Commission feels that the element of discrimination would affect the legality of the charge rather than the reasonableness of the amount thereof. It appears, therefore, that the

only question presented to the Commission for determination is whether the proposed charge can lawfully be made. [*Steele, supra,* XVII PSC Md. at 66–67.[5]]

In 1953 WSSC adopted a schedule of increased use and front foot benefit charges which became the subject of appeals to the PSC. Its then general counsel, Charles D. Harris (later a judge of the Eighth Judicial Circuit), advised the PSC that "it has jurisdiction in the present appeals and is obligated to hold hearings on the *reasonableness* of the assessments and charges...." XLIV PSC Md. 189, 190 (1953). Counsel based his opinion on the express wording of the statute, "the recognition of the Commission's jurisdiction by the Court of Appeals," [6] and on the prior cases decided pursuant to the Attorney General's opinion ruling that the statute "excluded any jurisdiction as to the legality of the charges." *Id.*

In a "one signature" opinion dated April 3, 1973, reported following the opinion in *Blumenthal v. WSSC,* LXIV PSC Md. 88, 93 (1973), the PSC was advised that, were it to find WSSC rates to be unreasonable, it could not alter the charges, but the matter would essentially have to be remanded to WSSC under appropriate standards determined

---

**5.** The PSC opinion attributes to then Assistant Attorney General John Hubner Rice the opinion from the Attorney General's Office on which the PSC relied. Portions of the opinion relied on by the PSC are quoted by it in *Steele* and those quoted portions are identical to the opinion published over the signature of Attorney General Robinson in 11 Op.Att'y Gen.Md. 253.

**6.** The 1918 statute passed a constitutional test in *Dahler v. WSSC,* 133 Md. 644, 106 A. 10 (1919). *Dahler,* in the course of describing the statute, mentions that the PSC "is given jurisdiction to determine upon appeal the reasonableness of all assessments, tax levies or service charges, as in the case of public service corporations." *Id.* at 649, 106 A. at 12.

*Dahler* was a challenge to the facial validity of the 1918 Act by way of an original injunction proceeding which "bypassed" the PSC. *Dahler* was decided when administrative law was in its embryonic state as a distinct body of legal principles. Accordingly, we give little weight to the fact that this Court made no comment concerning exhaustion of administrative remedies.

by the PSC.  And *see Blumenthal v. WSSC,* LXVIII PSC Md. 542, 544 (1977).

Illustrative of the type of case which the PSC does hear under § 6–110 is *Blumenthal v. WSSC, supra,* LXIV PSC Md. 88, where the reasonableness of increases in water and sewage service charges turned on aspects of WSSC's need for working capital.  The PSC has refused to hear complaints against WSSC involving issues more narrow than reasonableness of rates, *see, e.g., Smith v. WSSC,* LVII PSC Md. 76 (1966) (dismissing complaint alleging WSSC's failure to exempt complainant's property from front foot benefit charges), and it has refused to hear challenges to the legality of front foot benefit charges, *see, e.g., Steele v. WSSC,* XVII PSC Md. 155 (1926).  The PSC has also dismissed a complaint that front foot benefit charges bore no relation to the actual cost of improvements when the appeal was noted more than thirty days after the front foot benefit charge for the project was established and more than thirty days after the date of the notice to the complainant of the annual charge levied against the complainant's property. *Tylor v. WSSC,* LXIII PSC Md. 438 (1972).

In the case before us WSSC points to language appearing in *Blumenthal v. WSSC, supra,* LXVIII PSC Md. at 544, a case involving a challenge to the reasonableness of WSSC rates for water and sewer service which became effective July 1, 1975, and January 1, 1976.  In that case WSSC argued that, because the complainant had presented no evidence on the issue of reasonableness, the PSC was obliged to find the rates to be reasonable.  The PSC hearing examiner, however, viewed *Potomac Edison Co. v. PSC,* 279 Md. 573, 369 A.2d 1035 (1977) as authority for an independent review by the PSC exercising its expertise.  The examiner then said that, "[h]owever, a review of the record indicates that these rates were lawfully established pursuant to the applicable provisions of the WSS[C] code," had been approved by the local governments, and were reasonable.  LXVIII PSC Md. at 545.  This single statement cannot overcome the language of § 6–110 and its interpretation by the Attorney General, by the PSC, and by counsel to the PSC.

WSSC structures an argument based on the complaint to the PSC questioning the power of WSSC to adopt the Interim Sewer Service Charge which had a circuit court counterpart before this Court on appeal in *Northampton Corp. v. WSSC,* 278 Md. 677, 366 A.2d 377 (1976). In our *Northampton* WSSC made no argument that the special statutory remedy was a § 6–110 proceeding before the PSC, and this Court took no notice of a possible failure to have exhausted administrative remedies. After this Court sustained ISSC, WSSC moved to dismiss the complaints before the PSC. That motion was granted without objection by the complainants. WSSC now sees an indicia of PSC jurisdiction in the PSC's not having more swiftly dismissed the complaint in its *Northampton* from its docket. If there is any significance in the timing between the two proceedings, it does not favor WSSC.

While the PSC has been administratively applying the Attorney General's 1926 interpretation of "determin[ing] the reasonableness," the General Assembly has amended the statute by Ch. 231 of the Acts of 1955, by Ch. 337 of the Acts of 1970, and by Ch. 729 of the Acts of 1972. Chapter 805 of the Acts of 1981 brought all of the statutes governing WSSC into the Code of Public General Laws. Chapter 767 of the Acts of 1982 was a general revision, restatement, and recodification of the statutes applying to WSSC. No change of substance has been made by the General Assembly to § 6–110. This legislative acquiescence in the administrative construction gives rise to a strong presumption that the administrative interpretation is correct. *See Valentine v. Bd. of License Comm'rs of Anne Arundel Co.,* 291 Md. 523, 435 A.2d 459 (1981).

■ Section 6–110 does, as WSSC contends, create an administrative remedy. That remedy is, however, limited to the "reasonableness of any assessment, tax levy, or service charge of the WSSC." Thus, § 6–110 in the instant case gives rise to the anomaly that the plaintiffs' challenge to the power of WSSC to adopt SEOC is not embraced within that special statutory remedy while the plaintiffs' challenge to the reasonableness of the SEOC rates is subject to that special statutory remedy.

We emphasize that this holding results from the language of, and agency practice under, § 6–110, despite the holding's asymmetry with basic administrative law principles. In terms of the arguments presented by the parties in this case, we reject the oversimplified contention which the plaintiffs advance by citing *Comm'rs of Cambridge v. Eastern Shore Public Service Co.*, 192 Md. 333, 64 A.2d 151 (1949) for the proposition that an administrative remedy may be bypassed if a legal question of statutory interpretation is presented. Nor do we here apply the " 'constitutional exception' ... [which] permits a judicial determination without administrative exhaustion when there is a direct attack upon the power or authority (including whether it was validly enacted) of the legislative body to adopt the legislation from which relief is sought." *Harbor Island Marina, Inc. v. Calvert Co.*, 286 Md. 303, 308, 407 A.2d 738, 741 (1979). Nor do we imply that, in some other context, the scope of the language—"determine the reasonableness of any assessment, tax levy, or service charge"—would not present an issue of statutory interpretation to be decided initially by an administrative agency even in the face of an argument that the "constitutional exception" was presented. *See, e.g., Maryland Comm'n on Human Relations v. MTA, supra*, 294 Md. at 233–35, 449 A.2d at 389–90. What we do hold is that the administrative construction at the PSC of § 6–110 has become so encrusted on § 6–110 that there is not a special statutory remedy before that agency with respect to a legal challenge to the power of WSSC to adopt SEOC.

## B

The refunds sought by the plaintiffs raise the possibility that Art. 81, § 215 is a special statutory remedy requiring us to mandate dismissal of the action in the trial court. In relevant part § 215 provides:

> Whenever any person shall have erroneously or mistakenly paid to any State ... agency authorized to collect the same more money for ... charges, than was properly and

legally payable, ... he may file with such agency a written claim for the refund thereof.... Such claim for refund shall be ... supported by such documents as may be prescribed by the Comptroller....

The procedure for making claim for refund is found in Art. 81, § 216. It provides in part:

If after investigation and hearing such agency determines that such claim is just and proper and should be allowed, in whole or in part, it shall so indicate and shall forward the claim to the Comptroller ... for approval. If approved the claim for refund shall be allowed.... If the Comptroller ... refuses to approve the claim, the claim shall be disallowed.... The agency shall notify the taxpayer in writing of any action taken by it or by the Comptroller....

■ WSSC is not a state agency within the meaning of Art. 81, § 215. The budget of WSSC is not included in the state budget submitted by the Governor and approved by the General Assembly. WSSC's budget is approved by the county councils of the two counties within which the District lies. The refund provisions of Art. 81, §§ 215 and 216 contemplate a state agency which is at least subject to some role of the Comptroller in connection with disbursing funds. Once again, WSSC is a state agency which is out of the mainstream. Article 81, § 215 does not apply to the refund sought in the case before us. It is not a special statutory remedy and does not prevent an original action for a declaratory judgment on the issue of the power of WSSC to adopt SEOC.

## C

Nor is the initial determination of the issue of WSSC's power to adopt SEOC governed by the doctrine of primary jurisdiction. Primary jurisdiction "is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies." *Maryland Nat'l Capital Park & Planning Comm'n v. Washington Nat'l*

*Arena, supra,* 282 Md. at 601, 386 A.2d at 1225–26. The doctrine "comes into play when a court and agency have concurrent jurisdiction over the same matter ... and there is no statutory provision to coordinate the work of the court with that of the agency." *Id.* at 601, 386 A.2d at 1226 (citation omitted). Inasmuch as part I A of this opinion concludes that the PSC has no jurisdiction under § 6–110 to determine the statutory power issue, there is no concurrent jurisdiction between the trial court and the PSC on that issue.

▉ The problem presented here is not one in which both a court and an agency are authorized to decide an issue so that the question becomes which should proceed first on that common issue. Here the trial court had original jurisdiction to decide one issue (WSSC's power to adopt SEOC) while the PSC was statutorily designated as the agency initially to decide another issue (reasonableness of SEOC charges). In that alignment, whether the court or agency proceeds first is not a matter of primary jurisdiction, but simply a question of whether a stay should be granted as to one issue while another issue is decided in the appropriate forum. In the case before us WSSC never requested a stay in order first to proceed on the reasonableness of rates issue before the PSC.

## II

WSSC has briefed a laches argument. That defense was raised in WSSC's answer to the complaint and was rejected by the trial court in its decree, although the defense is not discussed in the trial court's opinion.

SEOC was first adopted June 13, 1979, to be effective July 1 of that year. Plaintiffs brought this suit on September 17, 1981. On analogy to the general three-year statute of limitations applicable to actions at law, laches does not apply here. *See Desser v. Woods,* 266 Md. 696, 704, 296 A.2d 586, 591 (1972).

■ WSSC proposes that the analogy be drawn instead to the 30 days provided by § 6–110(b). That statute, however, applies to the special statutory remedy before the PSC while the issue now under consideration, WSSC's authority to adopt SEOC, is not subject to that special statutory remedy. Where, as here, the claim under consideration properly invokes the original jurisdiction of the circuit court, the analogy for laches should not be to a time limit for initiating a special statutory administrative remedy applicable to a different theory of the case.

■ Even though analogy is properly made to the three-year statute, WSSC nevertheless claims it has been prejudiced in two ways. First, it points to the increase with the passage of time in the amount of SEOC collected and involved in the claims for a refund. Because we shall hold in part IV of this opinion that WSSC is not obliged to make any refund of SEOC collected from the plaintiffs or their class, this branch of WSSC's prejudice argument is moot.

The second claim of prejudice to WSSC lies in the disclosure in its official statements circulated to potential purchasers of issues of bonds and notes that litigation challenging SEOC is pending. The argument is that a higher interest rate may have been paid by WSSC on the offering than would have been paid had there been no litigation. The point is irrelevant to a defense based on delay by the plaintiffs in suing inasmuch as the argument depends on a suit having already been filed. The argument is also speculative because WSSC never proved any connection between the interest rate actually paid and this litigation.

### III

With respect to the merits of this controversy, the plaintiffs argue, and the trial court held, that the statutes governing WSSC do not authorize it to impose a special connection charge designed to pay a substantial part of the increase in WSSC's long-term debt obligations attributable to growth in the water and sewer system. WSSC, in effect,

admits that the power is not expressly conferred, but argues that it is implied in § 6–101. In this regard WSSC relies heavily on *Northampton, supra,* 278 Md. 677, 366 A.2d 377. Alternatively, WSSC contends that because it "is a public utility it has the same inherent power as does any other public utility to establish and structure the rates and charges which it determines should be applied to allocate properly the costs of serving its customers."

The only authority dealing with WSSC which is cited for this inherent power proposition is *WSSC v. Southern Management Corp.,* 58 Md.App. 136, 139 n. 1, 472 A.2d 505, 507 n. 1 (1984). The case was an original action in a circuit court to obtain refund of an alleged overpayment of water user charges which had been billed on an estimated basis and paid under protest by the user. The Court of Special Appeals affirmed judgment for the user based in part on § 6–104(b)(3) which provided that "the final bill for the 6 month period shall be based on the actual consumption adjusted by the previous estimates." In footnote 1 the court cited *Sims v. Alabama Water Co.,* 205 Ala. 378, 380, 87 So. 688, 689–90 (1920) for the proposition that "[w]here a consumer has a bona fide billing complaint with a public utility, the proper recourse is payment of the amount demanded under protest and suing for its recovery." *Southern Management* does not support the proposition that the scope of power of WSSC is to be tested by analogy to the powers of public utilities generally. Nor need we here express any view on whether or to what extent a "public utility" enjoys inherent rate-setting powers. WSSC exists only by virtue of statutes and its power is tested against those statutes.

WSSC also cites cases from other jurisdictions involving municipalities which imposed connection charges analogous to SEOC.[7] These cases have sustained the charges under

---

7. WSSC is not a municipality under Maryland Constitution Article XI–E. It has no power to govern. *See WSSC v. Pride Homes, supra,*

the particular charter or statutory authorization to the municipality involved. *See Associated Homebuilders of Greater East Bay, Inc. v. City of Livermore,* 56 Cal.2d 847, 17 Cal.Rptr. 5, 366 P.2d 448 (1961); *Loup-Miller Constr. Co. v. City & Co. of Denver,* 676 P.2d 1170 (Colo.1984); *Western Heights Land Corp. v. City of Fort Collins,* 146 Colo. 464, 362 P.2d 155 (1961); *Contractors & Builders Ass'n v. City of Dunedin,* 329 So.2d 314 (Fla.1976); *Norwick v. Village of Winfield,* 81 Ill.App.2d 197, 225 N.E.2d 30 (1967); *Seltzer v. Sterling Township,* 371 Mich. 214, 123 N.W.2d 722 (1963); *Metropolitan Utilities Dist. v. City of Omaha,* 171 Neb. 609, 107 N.W.2d 397 (1961); *Colonial Oaks West, Inc. v. Township of East Brunswick,* 61 N.J. 560, 296 A.2d 653 (1972); *Airwick Industries, Inc. v. Carlstadt Sewerage Auth.,* 57 N.J. 107, 270 A.2d 18 (1970), *cert. denied and appeal dismissed,* 402 U.S. 967, 91 S.Ct. 1666, 29 L.Ed.2d 132 (1971); *Lafferty v. Payson City,* 642 P.2d 376 (Utah 1982); *Banberry Development Corp. v. South Jordan City,* 631 P.2d 899 (Utah 1981); *Home Builders Ass'n v. Provo City,* 28 Utah 2d 402, 503 P.2d 451 (1972). These cases are distinguishable from the matter at hand. Typically, they involve broadly worded grants of express power authorizing the municipality to construct, operate, and maintain a water and sewer system and to establish just and reasonable rates and charges to pay for connection to and use of the system.

On the other hand, the general structure of Art. 29 which grants WSSC's powers usually relates a specific revenue-raising measure to identified costs. For example, § 6-101, from which WSSC says authority to impose SEOC is implied, reads:

(a)(1) For every service connection under § 3-104 of this article, the WSSC shall set a charge that the WSSC determines to be reasonable.

---

291 Md. at 539 n. 2, 435 A.2d at 798 n. 2; *State v. Canova,* 278 Md. 483, 494-97, 365 A.2d 988, 995-96 (1976).

(2) The charge shall be uniform throughout the sanitary district for connections of those sizes and classes for which the average cost reasonably may be ascertainable and for the actual cost for all other connections, subject to a revision of the charges annually by the WSSC.

(3) All property owners shall pay the charge at the office of the WSSC before the actual connection with any pipe or private property is made.

(b) Of all of the revenue over actual cost that is derived from the charges, the WSSC shall:

(1) Retain one-half of the revenue in a contingency fund for repair, replacement, or any extraordinary expense in the maintenance and operation of the water supply, sewerage, and drainage systems under the control of the WSSC; and

(2) Apply one-half of the revenue to pay the bonded debt of the WSSC.

The service connection under § 3–104 is a connection from a water main or sanitary sewer to the property line of a lot abutting a street or right of way in which the water main or sanitary sewer is installed. *See* § 3–104(a)(1) and the definition of "service connection" in § 1–101(h).

Front foot benefit charges are dealt with in Title 5 of Art. 29. Section 5–101(a) declares "[t]he construction or acquisition of water mains or sewers [to be] a benefit to all property that abuts the water mains or sewers." "To assess benefits for the construction of water supply and sewerage systems," § 5–101(b) directs WSSC to "divide all property that abuts on a street ... in which a water main or sanitary sewer is to be laid" into designated classes. The levy is based for each class of property on "[t]he approximate cost of the construction as an integral part of the whole system," among other factors. § 5–101(e)(1). A benefit charge is levied once a year, § 5–101(f)(2), "for a period of years co-extensive with the period of maturity of the bonds the proceeds of which financed the construction of the water mains or sewers." § 5–103(a). Section 4–107 then provides in part:

All sums collected by the WSSC for benefits levied against property for water supply, sewerage and drainage construction, as provided in § 5–101 of this article, shall be set aside as a separate fund to be known and designated as the "Current Bond Fund," from which fund interest shall be paid on all outstanding bonds, and the balance of the Fund shall be prorated monthly, and applied to the payment of the principal of maturing serial bonds and the payment into the joint "sinking fund" account, as provided under § 4–105 of this title, of the proportionate part of the principal of outstanding sinking fund bonds as the outstanding par value of both types of bonds bear to each other.

Section 4–105(a) provides that "there shall be levied against all the assessable property within [the District], by the County Councils of Montgomery and Prince George's counties, respectively" an ad valorem tax, annually, for the purpose of retiring WSSC notes and bonds. The property tax has not been used for many years for debt service on sanitary sewer and water projects, but it in effect forms a guaranty for WSSC's notes and bonds.

With the exception of monies derived from front foot benefit charges, user charges were the source of funds to WSSC for the payment of debt service prior to SEOC. Three sections of Art. 29 dealing with user charges are particularly relevant.

Section 6–104, dealing with "[s]ervice rates generally," in part provides:

(a) *Authority of WSSC.*—(1) To provide funds for maintaining, repairing, and operating its water supply, sewers, and drainage systems, including the overhead expense and proper depreciation allowance, together with funds for making any payment to the District of Columbia, as specified in this title, the WSSC shall make any service rate that the WSSC considers necessary.

(2) The rate:

(i) Shall be chargeable against all properties for a connection with any pipe under the WSSC's ownership;

(ii) Shall be uniform throughout the sanitary district; and

(iii) May be changed as necessary.

. . . .

(b) *Rates and bills generally.*—(1)(i) Except as provided in this section, the rate for service shall consist of a minimum or a ready to serve charge and a charge for water used.

(ii) The ready to serve charge is based on the size of the meter on the water connection leading to the property.

(iii) The charge for water used is based on the amount of water passing the meter during the period between the last 2 readings.

Thus, while the § 6–104(a) authorization to "make any service rate that the WSSC considers necessary" might, standing alone, encompass SEOC, that apparently broad grant is immediately restricted by § 6–104(b) to a ready-to-serve charge based on meter size and to a charge for water used. SEOC does not meet those limitations.

Authorization for including debt service costs in user charges is found in two provisions, one dealing with water and the other with sewer service.

Section 4–106 provides:

The WSSC shall annually determine the amount necessary to pay the principal and interest requirements of the bonds, and shall annually fix the water service charge of the sanitary district at such a sum as to produce, in addition to the costs of the service, and the requirements of any other bonds issued and outstanding the annual requirements of which are to be paid out of the water service, the amount determined as necessary to pay the annual requirements of the bonds hereby authorized. The sum so collected annually from water service charges shall be deducted from the amount which the WSSC has determined to be necessary to be raised by direct taxation upon certification to the County Councils of the counties.

Section 4–110, dealing with sewer bonds, in part provides:

(a) *Authorized; form; interest; exemption from taxation.*—For the purpose of providing funds for the design and construction of trunk sewers ..., sewage pumping stations and sewage disposal facilities ..., the WSSC ... may issue bonds of the sanitary district from time to time....

. . . .

(d) *Sewer usage charge.*—For the purpose of retiring the bonds authorized to be issued by this section and the payment of the interest thereon and for the purpose of paying for the cost of the maintenance of its sewerage system and its disposal facilities, including the overhead expense and proper depreciation allowance, and payments to the District of Columbia for disposal of sanitary district sewage, the WSSC shall be empowered and directed to make a sewer usage charge, chargeable against all properties connected to the WSSC's sewerage system.... The sum so collected annually for the payment of principal and interest due on outstanding bonds shall be deducted from the amount which the WSSC has determined to be necessary to be raised by direct taxation....

SEOC is not the connection charge *expressed* in § 6–101. The regular connection charge *expressed* in § 6–101 is separately imposed. It is distinct from the additional SEOC. WSSC characterizes SEOC as a "special" connection charge. The regular connection charge is based on the estimated cost of running pipe from a main in the street to the property line of an abutting lot. SEOC in theory represents, with adjustments, the capital cost to be incurred by WSSC to provide service to an individual dwelling unit or other property which comes onto the system for the first time. In point of fact the capital improvements required to service growth in the system are funded through borrowings. Article 29 identifies three revenue sources for payment of the principal and interest on WSSC's bonds and notes, namely, ad valorem taxes, front foot benefit charges, and water and sewer user charges. SEOC is none of the above. Yet SEOC was designed as an offset against debt service and is applied exclusively to reduce annual debt service costs. WSSC Resolution No. 79–586 which initially

adopted SEOC flatly recognizes that it is an "alternative approach to reduce the Commission's financial needs," namely, "for paying the capital and associated debt service costs of providing water and sewer service to accommodate future needs" in the District. It is an alternative, but one which currently has no legal foundation in the statutes to which WSSC owes its existence.

SEOC goes beyond the kind of special connection charge, ISSC, which was involved in our decision in *Northampton, supra.* WSSC adopted ISSC during the sewer moratorium. Because of a lack of capacity in the sewage treatment system, environmental law restrictions prohibited new hook-ups resulting in a halt to development in certain areas of the District. The State Department of Health instructed WSSC to construct three interim sewage treatment plants, in three different basins in the District. These plants had a projected useful life of from five to ten years and were to be in service only until adequate permanent facilities were operating. A special connection charge was adopted to pay for the interim treatment plants. As in the present case real estate developers challenged ISSC and argued that the interim sewage treatment plants were capital facilities which had to be paid for from the proceeds of bond issues which in turn had to be repaid by user charges. We held that "[s]ection 6–1 [now § 6–101] empowers the Commission to make reasonable and uniform connection charges." 278 Md. at 683, 366 A.2d at 381. We said that

> [t]here are obvious reasons why a facility with a projected useful life of from five to 10 years should not be financed by a long-term borrowing. Additionally, we are satisfied that the Commission has authority under Section 6–1 to impose a connection charge which reflects any "extraordinary expense in the maintenance and operation of the ... sewerage ... [system] under its control." [*Id.*[8]]

---

8. The opinion is quoting from the Washington Suburban Sanitary District Code (1970), § 6–1 which read in its entirety:

> For every water and sewer connection, as provided under section 83–74 [section 3–4], said commission shall make such charge as it shall determine to be reasonable, which charge shall be uniform throughout the sanitary district for connections of those sizes and classes for which average cost reasonably may be ascertainable, and the actual cost for all other connections, subject, however, to a

There are two distinctions between SEOC and ISSC which prevent extending the holding of *Northampton* to embrace authority implied under § 6–101 for charging SEOC. First, the relatively short physical life and contemplated use of the interim facilities to be paid for by ISSC permitted implying in *Northampton* the power to impose ISSC as a special connection charge under § 6–101. The facilities indirectly paid for by SEOC are capital projects, contained in the CIP, and are designed to have a much longer useful life. Second, the capital improvements involved in the SEOC computation are paid for with long-term borrowings, and SEOC revenues are later applied annually toward that debt. Any effort to imply in § 6–101 the power to impose a special connection charge for debt service encounters and conflicts with the express provisions, recited above, limiting the revenue sources for debt service to ad valorem taxation, front foot benefit charges, and sewer and water user charges. This is unlike the situation in *Northampton* where bonded indebtedness borrowing was not used to finance erecting the three interim treatment facilities. *See* Joint Record Extract, Vol. 1, at 506 (opinion of Circuit Court for Prince George's County) and Appellee's Brief at 8, *Northampton, supra,* 278 Md. 677, 366 A.2d 377.

■ In sum, an act of the General Assembly is required, as Art. 29 is now structured, in order to shift some of the load of debt service from user charges to connection charges.

## IV

We now address the issues concerning refund of the charges paid. On these issues the positions of the trial

revision annually by the commission. Said charge shall be paid by all property owners at the office of the commission before the actual connection with any pipe or private property is made. One-half of the revenue, above actual cost, derived from such charges shall be retained by the commission on a contingent fund for repairs, replacements, or any extraordinary expense in the maintenance and operation of the water supply, sewerage and drainage systems under its control. The remaining half shall be applied by the commission to the payment of the bonded debt as hereinafter provided.

court, of the plaintiffs, and of WSSC present a three-way split.  Each of the positions at least pays homage to the Maryland common law rule under which voluntary payments, made under a mistake of law, of taxes or other public charges are not recoverable.  We stated the rule most recently in *Potomac Electric Power Co. v. Prince George's Co.*, 298 Md. 185, 189, 468 A.2d 325, 327 (1983), by quoting from *Apostol v. Anne Arundel Co.*, 288 Md. 667, 672, 421 A.2d 582, 585 (1980).

"It is firmly established in this State that once a taxpayer voluntarily pays a tax or other governmental charge, under a mistake of law or under what he regards as an illegal imposition, no common law action lies for the recovery of the tax absent a special statutory provision sanctioning a refund.  This is true even if payment is made under protest.  Moreover, in these circumstances, no common law or declaratory judgment action lies to challenge the validity of a tax so paid.  Where there is a special statutory provision sanctioning a refund, although no particular statutory remedy is provided, an action in assumpsit is available.  However, where there is statutory authorization for a refund and a special statutory remedy set forth, that remedy is exclusive." [9]

---

**9.**  Cases which have either rested their holding squarely on the above-quoted rule or utilized the rule in reasoning to the holding, include: *Baltimore Co. v. Xerox Corp.*, 286 Md. 220, 227, 406 A.2d 917, 920 (1979); *White v. Prince George's Co.*, 282 Md. 641, 649–54, 387 A.2d 260, 265–68 (1978); *Rapley v. Montgomery Co.*, 261 Md. 98, 100, 274 A.2d 124, 125 (1971); *Wasena Housing Corp. v. Levay*, 188 Md. 383, 387–89, 52 A.2d 903, 905–06 (1947); *Magness v. Loyola Federal Sav. & Loan Ass'n*, 186 Md. 569, 580–81, 47 A.2d 769, 774–75 (1946); *Helser v. State*, 128 Md. 228, 231–32, 97 A. 539, 540 (1916); *Mayor & City Council of Baltimore v. Harvey*, 118 Md. 275, 277–80, 84 A. 487, 488–89 (1912); *Monticello Distilling Co. v. Mayor & City Council of Baltimore*, 90 Md. 416, 433, 45 A. 210, 214 (1900) (dicta); *Mayor & City Council of Baltimore v. Hussey*, 67 Md. 112, 116, 9 A. 19, 20–21 (1887); *George's Creek Coal & Iron Co. v. Co. Comm'rs of Allegany Co.*, 59 Md. 255, 259–62 (1883); *Bernei v. Mayor & City Council of Baltimore*, 56 Md. 351, 360 (1881); *Awalt v. Eutaw Bldg. Ass'n*, 34 Md. 435, 436–37 (1871); *Lester v. Mayor & City Council of Baltimore*, 29 Md. 415, 418–20 (1868); *Morris v. Mayor & City Council of Baltimore*, 5 Gill 244, 247–48 (1847); *Mayor & City Council of Baltimore v. Lefferman*, 4 Gill 425, 431–37 (1846).

Because there is no statutory provision authorizing a refund of the kind of public charges involved in this case, the principal refund issue is whether payments of SEOC by the plaintiffs and members of the class were voluntarily made within the meaning of the Maryland rule. Plaintiffs say that none of the payments was voluntarily made. WSSC says all of the payments were voluntarily made. The trial court held that payments made prior to the institution of this suit were "voluntary" and could not be recovered, while payments made after suit was filed were not "voluntary" and could be recovered. The result urged by WSSC is the correct one under our cases.

Plaintiffs emphasize that within the District WSSC controls the issuance of plumbing permits. WSSC will not issue a plumbing permit unless SEOC is paid. Without a plumbing permit the developer of unimproved land which is to be connected to the system cannot obtain a building permit. Without a building permit the developer cannot build. If the developer cannot build on unimproved land, the developer is out of business on that land. Plaintiffs equate this result from nonpayment of SEOC with two decisions on which they principally rely where payments made to release or protect property were held to be compulsory.

*Jones v. Sherwood Distilling Co.*, 150 Md. 24, 132 A. 278 (1926) presented a jury question of fraud and extortion. The agent for the plaintiff, a Massachusetts resident who owned 200 barrels of whiskey stored in the defendant distiller's warehouse, was responsible for getting the whiskey shipped to Scotland aboard a steamship which was scheduled to leave Baltimore as early as January 1, 1923. On December 28, 1922, the agent presented certificates at the distillery to Haim, its treasurer, who claimed he could not then determine the charge for release of the whiskey. The next day the agent, acting on instructions received by telephone, went to a certain apartment in Baltimore City where a man named Aylward was present. Aylward demanded $8,000 in cash to release the whiskey. The agent paid Aylward $1,000 on account at 10:00 a.m. on December 30 on a street corner and on the afternoon of January 2 paid

the balance of $7,000 at the apartment in the presence of Haim. The latter then receipted a statement reflecting the charges against the whiskey to be $3,161.30. The next day the whiskey was released in time to be shipped. The owner sued to recover the excess paid. He had no proof that Aylward was an agent of the distiller. Despite the distiller's argument that Haim's conduct was fraudulent and unauthorized, we said that the distiller's liability for the excess over the true warehouse charge was properly left to the jury.

The distiller also raised a voluntary payment defense. On that point this Court held that the

> facts and circumstances, if found by the jury to exist, would be sufficient to sustain a finding that the payment of the appellant was a compulsory one, unless the appellant had an adequate legal remedy for the recovery of the goods, and chose to pay the money rather than resort to that remedy, or unless the agent of the appellant was himself guilty of fraud or negligence[, likewise a question for the jury]. [*Id.* at 38, 132 A. at 283.]

The limited period of time and the distance between the plaintiff and his agent combined to make the ordinary remedy, replevin, an inadequate remedy in that case.

Plaintiffs also press *Martin G. Imbach, Inc. v. Deegan,* 208 Md. 115, 117 A.2d 864 (1955). There a sheriff's deputy was at the plaintiff's premises, about to seize the plaintiff's chattels under a writ of execution on judgment. To prevent the seizure the plaintiff paid to the deputy on behalf of the executing creditor the full judgment debt with interest and costs, and also certain poundage fees demanded by the deputy. We held that the sheriff was not entitled to poundage fees where no seizure had been made and that the plaintiff's payment of poundage was compulsory.

■ In *Jones* and *Imbach* owners of property paid to avoid an immediate seizure or wrongful retention of their property. This factor made the payment compulsory. That factor is not present in the case before us, unless we equate the plaintiffs' inability lawfully to build and ultimately to sell with the seizures of property in *Jones* and in *Imbach.* But the decision to pay to government a disputed charge in

order for a business transaction to proceed is not one made under compulsion solely because the loss suffered during the delay in litigating the validity of the charge clearly outweighs the amount of the charge itself. In the case before us the developer plaintiffs say they paid SEOC in order to complete their projects. But the trial court essentially concluded that the selling price of a completed building included the developer's SEOC cost.

The kind of economic compulsion argument which plaintiffs advance is not as strong as the one rejected in *Rapley v. Montgomery Co.*, 261 Md. 98, 274 A.2d 124 (1971). There the plaintiffs paid under protest a transfer tax of $230,-988.34 in order to record in the land records and thereby consummate the sale of realty for a consideration of $4,069,805.72. The taxpayers argued, and we said "with some justification," that "injunctive relief is simply inappropriate if a real estate transaction of the magnitude of theirs is to be consummated in an orderly fashion...." *Id.* at 103, 274 A.2d at 127 (citation omitted). We nevertheless held the payment was voluntary. Because there was no applicable statute changing the common law rule, no refund was required. Indeed, the position of the plaintiffs here is analogous to that of the subdivision developer in *Wasena Housing Corp. v. Levay*, 188 Md. 383, 52 A.2d 903 (1947), who argued that, had he not paid the allegedly unlawfully levied real estate taxes on the uncompleted houses in his subdivision, he would have been prevented from recording deeds to purchasers or from recording a mortgage securing future financing. Because the argument was not raised in the trial court, it was unnecessary to decide the point. Nevertheless, the Court through Judge Henderson observed that "so long as the rule prevails that the direct lien of taxes, with threat of distress and sale, does not constitute duress, we could hardly ascribe such an indirect effect to the recording law." *Id.* at 389, 52 A.2d at 906. And *see Walk-A-Show, Inc. v. Stanton*, 182 Md. 405, 35 A.2d 121 (1943) (Payments over 44 days of $100 per day in license fees under invalid law held voluntary. Payments began after the plaintiff had spent $6,000 and contracted for many thousands more in arranging for the licensed event.).

■ As noted in *Jones* the availability of an adequate remedy prevents a payment from being involuntary. *Imbach* recognized that, with respect to taxes and public charges, the availability of an injunction against collection makes their payment voluntary:

> In the *Lester* [, 29 Md. 415 (1869)], *Lefferman* [, 4 Gill 425 (1846)] and *Wasena Housing Corp.* cases, *supra,* relied upon by the appellee, the availability of injunction proceedings to *prevent* the enforcement or collection of an illegal or allegedly illegal tax or charge was held to make the payments voluntary rather than compulsory, notwithstanding that they were made under protest. [208 Md. at 134, 117 A.2d at 873 (emphasis added).]

■ Plaintiffs attempt to counter this feature of the Maryland voluntary payment rule by arguing that injunctive relief was not available in the case before us because there was a right to a refund if this suit were successful. The argument assumes an erroneous premise. There is no refund statute applicable to these payments. The payments are not recoverable as involuntary because an injunction to prevent collection was available as a remedy.

The trial court distinguished between payments made before and after suit was filed and ordered restitution of the latter apparently on the theory that the mere institution of suit rendered subsequent payments involuntary. References in our cases to injunctions in connection with the voluntary payment rule are by way of rejecting a contention that threatened use of the enforcement procedure underlying the tax or public charge makes payment of the amount demanded a compulsory payment. Such payments are considered voluntary because collection of the charge, if invalid, could have been prevented by an injunction, in the absence of any other special remedy. *See Imbach, supra.*

Comparison of *Lester v. Mayor & City Council of Baltimore, supra,* 29 Md. 415, with *Mayor & City Council of Baltimore v. Porter,* 18 Md. 284 (1862) demonstrates the point. Both Porter and Lester owned property abutting North Avenue, on the then boundary of Baltimore City. Each was assessed a front foot benefit charge which was enforceable by lien on the property and ultimately by public

sale. Lester paid. Porter did not. He obtained a perpetual injunction against collection. Then Lester sued for a refund. He pointed out that he had paid the charge after his property was advertised for sale and because he did not want the City to sell it. In affirming judgment for the City, the Court, through Judge Alvey, said:

> Instead of paying the bill for grading, the appellant should have pursued a similar course to that pursued by Porter ..., and by testing the validity of the claim, *defeated it.* Failing to avail himself of a legal remedy for his protection, and electing to pay the demand made of him, rather than resort to litigation, he must abide his election, and be held as concluded by his conduct, with knowledge of all the facts. [29 Md. at 419–20 (emphasis added and citation omitted).]

This same comparison was pithily pointed out in *Rapley* —"but *Lester* took the wrong road, and *Porter,* the right one." 261 Md. at 103, 274 A.2d at 127. Similarly, in *Wasena Housing Corp., supra,* we said, citing *Lester,* "that payment under protest, under threat and advertisement of sale, is a voluntary payment, because collection could be prevented by injunction." 188 Md. at 388, 52 A.2d at 905. And *see Mayor & City Council of Baltimore v. Harvey,* 118 Md. 275, 278, 84 A. 487, 488 (1912).

■ Consequently, the pendency of a suit to invalidate a public charge at the time it is paid does not, standing alone, make the challenger's payment involuntary. *Apostol, supra,* 288 Md. 667, 421 A.2d 582 illustrates the point. Taxpayers, by suit for declaratory judgment and injunction, had attacked the facial validity of a property tax rate for a given year. While that suit was pending they paid the taxes. We dismissed the suit. There was a refund remedy in Art. 81. We reasoned that, once the taxes were paid, the refund remedy necessarily became exclusive because, under the voluntary payment rule, the declaratory judgment and injunction remedies had been extinguished. Essential to that rationale was considering those post-suit payments as voluntary.

■ We hold that the payments of SEOC made by the developer plaintiffs and developer members of the class

were voluntary and are not recoverable. The rights of the successors in interest to the developers rise no higher than do those of the developers.

## V

The remaining issue is one raised by WSSC. It asserted that the trial court erred in enlarging the class after trial. The point seems clearly to have been presented as an alternative designed to reduce the exposure to refund claims if plaintiffs prevailed on that point. In view of our holding that there will be no refunds, we consider WSSC's point withdrawn.

One further observation should be made involving a point which cuts across several of the issues as organized above. As part of its argument that plaintiffs' remedy was before the PSC, WSSC suggested that the PSC could have ordered a refund. In support WSSC cited *Public Service Comm'n v. Delmarva Power & Light Co.*, 42 Md.App. 492, 400 A.2d 1147, *cert. denied*, 286 Md. 746 (1979). There the court sustained an order of the PSC which in part had directed an electric company to refund overcharges of $400,-000. In the present action WSSC says *Delmarva* means that the PSC could order WSSC to make refunds as part of the administrative remedy ordered under § 6–110. *Delmarva*, however, found the PSC's authority to order refunds to have been conferred primarily by Md.Code (1957, 1980 Repl.Vol.), Art. 78, § 56 which treats generally of the PSC's supervision and regulation of "all public service companies." [10] WSSC is not one among "all public service companies" within the meaning of § 56.

---

**10.** Art. 78, § 56 reads:

The Commission shall supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality. To these ends, the Commission shall enforce compliance by such companies with all the requirements of law, including, but not limited to requirements

We have seen, *supra,* part I A, that the PSC exercises only a limited jurisdiction over WSSC. The PSC may find a general WSSC rate to be unreasonable, but the PSC may not set what it believes to be a reasonable rate. Absent fixing the latter, the PSC could not determine the amount of the unreasonable excess to be refunded. Further, if a governmental body became a public service company under Art. 78 by the mere fact of its furnishing water or sewer service, then there would be no need for Art. 78, § 55. It provides that "[u]pon written application of any county, sanitary district, or municipal corporation of this State, the Commission shall fix or alter the rates (and only the rates) for water supplied within the boundaries of the applicant by any other county or municipal corporation, as if the supplying subdivision were a water company." And *see* 63 Op. Att'y Gen.Md. 678 (1978). Thus, even assuming that the instant suit in some way complied with the time limit set in § 6–110, our deciding the merits on the absence of statutory power has not deprived the plaintiffs of an opportunity for a refund ordered by the PSC under § 6–110.

For all of the foregoing reasons, we affirm the declaratory judgment, the injunction against collection, the denial of restitution of SEOC payments made prior to the filing of the instant action, and the composition of the class.[11] That portion of the judgment below ordering restitution of SEOC paid after institution of this suit is reversed.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART, WITHOUT A NEW TRIAL. COSTS TO BE PAID ONE–HALF BY WASHINGTON SUBURBAN SANITARY COMMISSION AND ONE–HALF BY THE APPELLEES AND CROSS APPELLANTS.

---

with respect to financial condition, capitalization, franchises, plant, manner of operation, rates, and service. The powers and duties enumerated specifically in this subtitle are not intended to limit the scope of the general powers and duties of the Commission provided for by this article.

**11.** The order establishing the class may or may not have future relevance to the plaintiffs, *inter se,* with respect to costs and expenses.

## ON MOTION FOR RECONSIDERATION

PER CURIAM:

In a Motion for Reconsideration Plaintiffs argue that payments of SEOC made to WSSC after the trial court filed its opinion should be excluded from the operation of the voluntary payments rule. That opinion contained a statement of the court's intention to stay injunctive relief and the final decree included a stay "until a final appellate decision and mandate . . . ." Plaintiffs assert that the stay made injunctive relief unavailable and left them no alternative but to pay the illegal charge.

Payments of illegal public charges are voluntary and not recoverable, in the absence of a refund statute, because injunction is available as a remedy. Our opinion emphasized that we spoke of an injunction which *prevents* the enforcement or collection of the charge (*Imbach v. Deegan, supra,* 208 Md. at 134, 117 A.2d at 873) and thereby *defeats* the charge (*Lester v. Baltimore, supra,* 29 Md. at 420). An injunction which will not be in operation unless and until the illegality of the public charge is affirmed on appeal does not prevent a public body from collecting the illegal charge.

Nor did the trial court's stay of the injunction here leave the Plaintiffs without any alternative, save payment. A stay is itself an injunction and is immediately appealable under Md. Code (1974, 1984 Repl. Vol.), § 12–303(c)(1) of the Courts and Judicial Proceedings Article. Where, as here, the stay is embodied in the final decree, the appeal of the stay could have been severed from the appeal and cross-appeal and advanced for argument by order of the Court of Special Appeals, upon a sufficient showing by the Plaintiffs. The degree of economic hardship on the Plaintiffs produced by continued collection on the part of WSSC and the absence of a refund statute would have been relevant both to the motion to sever and advance and on the merits of continuing the stay. These factors do not, however, convert what is a voluntary payment under our cases into an involuntary payment.

*Motion for reconsideration denied.*